NICHOLS KASTER & ANDERSON LLP
Matthew C. Helland, CA State Bar No. 250451
Helland@nka.com
One Embarcadero Center, Suite 720
San Francisco, CA  94111
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

NICHOLS KASTER & ANDERSON, PLLP
James H. Kaster, CA State Bar No. 248949
kaster@nka.com
4600 IDS Center, 80 S. 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile:  (612) 338-4878

Attorneys for Plaintiff

GORDON C. YOUNG, CASB NO. 158100
Gordon.Young@kyl.com
JULIE A. KOLE, CASE NO. 203681
Julie.Kole@kyl.com
ANNE MORIARTY, CASB NO. 251803
Annie.Moriarty@kyl.com
KEESAL, YOUNG & LOGAN
A Professional Corporation
450 Pacific Avenue
San Francisco, California 94133
Telephone: (415) 398-6000
Facsimile:  (415) 981-0136

Attorneys for Defendant
PIPER JAFFRAY & CO.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Charles Jason Moran,<br><br>            Plaintiff,<br><br>v.<br><br>Piper Jaffray & Co.,<br>d/b/a Piper Jaffray,<br><br><br>            Defendant. | **CASE NO: 08-cv-3188 (JSW)**<br><br><br>**JOINT STIPULATION AND [proposed] ORDER GRANTING PLAINTIFF LEAVE TO FILE HIS FIRST AMENDED COMPLAINT**<br><br><br>Complaint Filed: June 19, 2008<br>Honorable Jeffrey S. White |

**STIPULATION AND [proposed] ORDER**

1    By stipulation and agreement of the parties, and pursuant to Fed. R. Civ. Pro. 15(a),

2    Defendant hereby grants its consent for Plaintiff to file his First Amended Complaint, attached

3    hereto as Exhibit A.

4    The parties further stipulate and agree that Defendant's Answer shall be due 60 days from

5    the date of filing the First Amended Complaint.

6

7    Dated:  July 17, 2008                    NICHOLS KASTER & ANDERSON, LLP

8                                             By:    /s/Matthew C. Helland_____

9                                                    Matthew C. Helland

10                                           NICHOLS KASTER & ANDERSON, PLLP

11                                           Attorneys for Plaintiffs

12   Dated:  July 17, 2008                    KEESAL, YOUNG & LOGAN

13                                            By:    /s/Anne Moriarty_____.

14                                                   Anne Moriarty

15                                           Attorneys for Defendant

16                                           PIPER JAFFRAY & CO.

17

18

19   Having reviewed the foregoing stipulation between the parties, Plaintiff's request for leave to file

20   his First Amended Complaint IS HEREBY GRANTED.

21   IT IS SO ORDERED.

22

23   Dated: _____                        _____

                                             Honorable Jeffrey S. White

24                                           United States District Court Judge

25

26

27

28

-2-

**STIPULATION AND [proposed] ORDER**

1
2
3
4

NICHOLS KASTER & ANDERSON LLP
Matthew C. Helland, CA State Bar No. 250451
Helland@nka.com
One Embarcadero Center, Suite 720
San Francisco, CA  94111
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

5
6
7
8
9

NICHOLS KASTER & ANDERSON, PLLP
James H. Kaster, CA State Bar No. 248949
kaster@nka.com
4600 IDS Center, 80 S. 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile:  (612) 338-4878

10

Attorneys for Plaintiff

11
12

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

13
14
15
16
17
18
19
20

Charles Jason Moran,

                     Plaintiff,

v.

Piper Jaffray & Co.,
d/b/a Piper Jaffray,

                     Defendant.

**CASE NO: 08-cv-3188 (JSW)**

**FIRST AMENDED COMPLAINT FOR
DECLARATORY RELIEF**

Complaint Filed: June 19, 2008
Honorable Jeffrey S. White

21
22
23
24
25
26
27
28

**FIRST AMENDED COMPLAINT**

1   Plaintiff, by his attorneys Nichols Kaster & Anderson, brings this action against Defendant for
2   declaratory relief.  Plaintiff states the following as his claims against Defendant:

3                                   **PARTIES**

4        1.      Plaintiff Charles Jason Moran ("Moran") is an individual who resides in San
5   Francisco, California (San Francisco County) where he was employed by Piper Jaffray & Co.,
6   d/b/a Piper Jaffray.

7        2.      Defendant Piper Jaffray & Co., d/b/a Piper Jaffray ("Piper Jaffray") is a Delaware
8   corporation doing business in California, including in San Francisco.

9                                    **FACTS**

10       3.      Moran began working for Piper Jaffray in San Francisco, California as an
11  investment banker on or about April 19, 1999.

12       4.      As a part of his compensation with Piper Jaffray, Moran received restricted shares
13  of Piper Jaffray stock.  In conjunction with receipt of that stock, Moran entered into Restrictive
14  Stock Agreements.

15       5.      Moran received a grant of stock in 2006.  He entered into a Restrictive Stock
16  Agreement in connection with that grant ("the 2006 Agreement").  A true and correct copy of that
17  agreement is attached hereto as Exhibit A.

18       6.      Moran received subsequent grants of stock in 2007 and 2008, entering into
19  Restrictive Stock Agreements each year ("the 2007 Agreement" and "the 2008 Agreement,"
20  collectively with the 2006 Agreement, "The Agreements").  The 2007 and 2008 Agreements
21  varied slightly from the 2006 Agreement.  True and correct copies of the 2007 and 2008
22  Agreements are attached hereto as Exhibits B and C, respectively.

23       7.      The Agreements explain how and when employee stock shares will vest and the
24  restrictions accompanying the shares.

25       8.      The 2006 Agreement contains a non-compete agreement and a non-solicitation
26  agreement giving Piper Jaffray the right to cancel Moran's shares if violated.

27       9.      The 2007 and 2008 Agreements dictate that, upon leaving the company, Moran is
28  required to sign a Post-Termination Agreement with Piper Jaffray in order to prevent his

**FIRST AMENDED COMPLAINT**

1   restricted stock shares from forfeiting (the "Contemplated Post-Termination Agreement").  The

2   Contemplated Post-Termination Agreement includes a non-compete provision and a non-

3   solicitation provision.

4           10.     Both the non-compete provision in the 2006 Agreement, and the Contemplated

5   Post-Termination Agreement in the 2007 and 2008 Agreements, would prevent Moran from

6   engaging in a lawful profession, namely, his field of investment banking.

7           11.     Moran's employment with Piper Jaffray ended on April 14, 2008.

8           12.     Moran has not signed a Post-Termination Agreement with Piper Jaffray.

9           13.     Upon information and belief, Piper Jaffray has not yet exercised its purported right

10   under the Agreements to forfeit Moran's restricted shares.

11                                          **COUNT 1**

12                      **Declaratory Relief pursuant to 28 U.S.C. § 2201**

13           14.      By reference hereto, Plaintiff incorporates Paragraphs 1 through 13 of his

14   Complaint.

15           15.     Cal. Bus. Prof. Code § 16600 declares that: "every contract by which anyone is

16   restrained from engaging in a lawful profession, trade, or business of any kind is to that extent

17   void."

18           16.     Sections 2(d)(iii) and 2(d)(iv) of the 2007 and 2008 Agreements, and Sections

19   2(c)(ii), 2(c)(iii) and 2(c)(v) of the 2006 Agreement, violate Cal. Bus. Prof. Code § 16600

20   because they allow Defendant to forfeit Plaintiff's stocks if he accepts employment within his

21   field and/or solicits Defendant's current or former clients, thereby placing an unlawful restraint

22   on Plaintiff's ability to engage in a lawful profession.  Under 28 U.S.C. § 2201, Plaintiff is

23   entitled to a declaration that these agreements are void and unenforceable under California Law.

24                                    **PRAYER FOR RELIEF**

25           WHEREFORE, Plaintiff Charles Jason Moran prays for judgment against Defendant Piper

26   Jaffray as follows:

27           1.      For a declaratory judgment pursuant to 28 U.S.C. § 2207 that Sections 2(d)(iii) and

28   2(d)(iv) of the 2007 and 2008 Agreements and Sections 2(c)(ii), 2(c)(iii), and 2(c)(v) of the 2006

**FIRST AMENDED COMPLAINT**

1    Agreement are void under Cal. Bus. Prof. Code § 16600; and

2         2.    For such other and further relief, in law or equity, as this Court may deem

3    appropriate and just.

4

5    Dated:_____                  NICHOLS KASTER & ANDERSON, LLP

6                             By:   _____

7                                    Matthew C. Helland

8                      NICHOLS KASTER & ANDERSON, PLLP

9                      Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-

**FIRST AMENDED COMPLAINT**

PIPER JAFFRAY COMPANIES
AMENDED AND RESTATED
2003 ANNUAL AND LONG-TERM INCENTIVE PLAN

RESTRICTED STOCK AGREEMENT
(Annual Grant)

| Name of Employee:   Charles J Moran | |
| --- | --- |
| REDACTED | Date of Issuance:    02/21/06 |
| Vesting Schedule pursuant to Section 2: | |
| Vesting Date(s)<br>02/21/09 | REDACTED |

This is a Restricted Stock Agreement ("Agreement") between Piper Jaffray Companies, a Delaware corporation (the "Company"), and the above-named employee of the Company (the "Employee").

## Recitals

WHEREAS, the Company maintains the Piper Jaffray Companies Amended and Restated 2003 Annual and Long-Term Incentive Plan, as amended from time to time (the "Plan");

WHEREAS, the Board of Directors of the Company has appointed the Compensation Committee (the "Committee") with the authority to determine the awards to be granted under the Plan; and

WHEREAS, the Committee or its delegee has determined that the Employee is eligible to receive an award under the Plan in the form of restricted stock and has set the terms thereof;

NOW, THEREFORE, the Company hereby grants this award to the Employee under the terms set by the Committee as follows.



EXHIBIT
A

1

AM2003RSW

## Terms and Conditions[*]

1.   <u>Grant of Restricted Stock.</u>

(a)    Subject to the terms and conditions of this Agreement, the Company has granted to the Employee the number of Shares specified at the beginning of this Agreement. These Shares are subject to the restrictions provided for in this Agreement and are referred to collectively as the "Restricted Shares" and each as a "Restricted Share."

(b)    The Restricted Shares will be evidenced by a book entry made in the records of the Company's transfer agent in the name of the Employee (unless the Employee requests a certificate evidencing the Restricted Shares). All restrictions provided for in this Agreement will apply to each Restricted Share and to any other securities distributed with respect to that Restricted Share. Unless otherwise permitted by the Committee in accordance with the terms of the Plan, the Restricted Shares may not (until such Restricted Shares have vested in the Employee in accordance with all terms and conditions of this Agreement) be assigned or transferred other than by will or the laws of descent and distribution and shall not be subject to pledge, hypothecation, execution, attachment or similar process. Each Restricted Share will remain restricted and subject to forfeiture to the Company unless and until that Restricted Share has vested in the Employee in accordance with all of the terms and conditions of this Agreement. Each book entry (or stock certificate if requested by the Employee) evidencing any Restricted Share may contain such notations or legends and stock transfer instructions or limitations as may be determined or authorized by the Company in its sole discretion. If a certificate evidencing any Restricted Share is requested by the Employee, the Company may, in its sole discretion, retain custody of any such certificate throughout the period during which any restrictions are in effect and require, as a condition to issuing any such certificate, that the Employee tender to the Company a stock power duly executed in blank relating to such custody.

2.   <u>Vesting.</u>

(a)    If the Employee remains continuously employed (including during the continuance of any leave of absence approved by the Company or an Affiliate) by the Company or an Affiliate, then the Restricted Shares will vest in the numbers and on the dates specified in the Vesting Schedule at the beginning of this Agreement.

(b)    If the Employee's employment by the Company or an Affiliate terminates because of the Employee's death (or if the Employee dies within 90 days after termination of employment for any reason other than for Cause (as defined below)), then the unvested Restricted Shares will immediately vest in full.

(c)    If the Employee's employment with the Company or an Affiliate terminates for any reason, other than for Cause (as defined below) or because of the Employee's

---

[*]   Unless the context indicates otherwise, terms that are not defined in this Agreement shall have the meaning set forth in the Plan.

AM2003RSW

death, then the Restricted Shares shall continue to vest in accordance with the Vesting Schedule set forth above; provided, however, that any remaining Restricted Shares which do not become vested will immediately be forfeited in accordance with Section 4 of this Agreement if the Employee does any of the following after such termination:

(i)     uses, discloses or misappropriates any Company-Related Information (as defined below) unless the Company or an Affiliate consents otherwise in writing. "Company-Related Information" means any confidential or secret knowledge or information of the Company or an Affiliate that the Employee has acquired or become acquainted with during the Employee's employment with the Company or an Affiliate, including, without limitation, any confidential customer list, confidential business information, confidential materials relating to the practices or procedures of the Company or an Affiliate, or any other proprietary information of the Company or an Affiliate; provided, however that Company-Related Information shall not include any knowledge or information that is now published or which subsequently becomes generally publicly known in the form in which it was obtained from the Company or an Affiliate, other than as a direct or indirect result of the Employee's disclosure in contradiction of this Section 2(c);

(ii)     without the prior written consent of the Company or an Affiliate, directly or indirectly, owns, manages, operates, controls or participates in the ownership, management, operation or control of, or becomes connected as an officer, employee, partner, director, consultant, independent contractor or otherwise with, or has any financial interest or other pecuniary interest in, any Competing Business (as defined below). A "Competing Business" means any corporation, partnership, limited liability company or other business association, organization or entity or person of any kind whatsoever that (i) competes or plans to compete with the Company or any Affiliate in any line of business or (ii) otherwise offers any type of securities, investment or other financial products or services as a principal part of its business, regardless of whether such products or services are currently offered, or proposed to be offered, by the Company or any Affiliate. Notwithstanding the foregoing, ownership, for passive personal investment purposes only, of less than 5% of the voting stock of any publicly held corporation shall not by itself result in forfeiture of the Restricted Shares;

(iii)     without the prior written consent of the Company or an Affiliate, accepts a position as an officer, employee, partner, consultant or independent contractor with any corporation, partnership, limited liability company or other business association, organization or entity or person of any kind whatsoever (regardless of whether such position is with a Competing Business) if such position involves duties, responsibilities or expertise similar to that of the Employee's position of employment with the Company or an Affiliate at the time of the Employee's termination of such employment;

(iv)     directly or indirectly, on behalf of the Employee or any other person (including a Competing Business), solicits for employment in a Competing

3

AM2003RSW

Business any person who was employed by the Company or an Affiliate within three years prior to the date of the Employee's termination of employment; or

(v)    directly or indirectly, on behalf of the Employee or any other person (including a Competing Business), solicits any customers, clients or accounts of the Company or any Affiliate or otherwise seeks to divert such customers, clients or accounts away from the Company or any Affiliate.

(d)    Notwithstanding any other provisions of this Agreement to the contrary, the Committee may in its sole discretion, declare at any time that the Restricted Shares, or any portion thereof, shall vest immediately.

3.    Lapse of Restrictions.  Upon the vesting of any Restricted Shares, such vested Restricted Shares will no longer be subject to forfeiture as provided in Section 4 of this Agreement.

4.    Forfeiture.  If (i) the Employee attempts to pledge, encumber, assign, transfer or otherwise dispose of any of the Restricted Shares (except as permitted by Section 1(b) of this Agreement) or the Restricted Shares become subject to attachment or any similar involuntary process in violation of this Agreement, or (ii) the Employee's employment with the Company or an Affiliate (A) is terminated for Cause or (B) terminates under the circumstances covered by Section 2(c) of this Agreement and the Employee subsequently violates any of the restrictions contained in such Section, then any Restricted Shares that have not previously vested shall be forfeited by the Employee to the Company, the Employee shall thereafter have no right, title or interest whatever in such Restricted Shares, and, if the Company does not have custody of any and all certificates representing Restricted Shares so forfeited, the Employee shall immediately return to the Company any and all certificates representing Restricted Shares so forfeited. Additionally, the Employee will deliver to the Company a stock power duly executed in blank relating to any and all certificates representing Restricted Shares forfeited to the Company in accordance with the previous sentence or, if such stock power has previously been tendered to the Company, the Company will be authorized to deem such previously tendered stock power delivered, and the Company will be authorized to cancel any and all certificates representing Restricted Shares so forfeited and to cause a book entry to be made in the records of the Company's transfer agent in the name of the Employee (or a new stock certificate to be issued, if requested by the Employee) evidencing any Shares that vested prior to forfeiture.  If the Restricted Shares are evidenced by a book entry made in the records of the Company's transfer agent, then the Company will be authorized to cause such book entry to be adjusted to reflect the number of Restricted Shares so forfeited.  "Cause" means (i) the Employee's continued failure to substantially perform his or her duties with the Company or an Affiliate after demand for substantial performance is delivered to the Employee, (ii) the Employee's conviction of a crime (including misdemeanors) that, in the Company's determination, impairs the Employee's ability to perform his or her duties with the Company or an Affiliate, (iii) the Employee's violation of any policy of the Company or an Affiliate that the Company deems material, (iv) the Employee's violation of any securities law, rule or regulation that the Company deems material, (v) the Employee's engagement in conduct that, in the Company's determination, exposes the Company

4

or an Affiliate to civil or regulatory liability or injury to their reputations, (vi) the Employee's engagement in conduct that would subject the Employee to statutory disqualification pursuant to Section 15(b) of the Exchange Act and the regulations promulgated thereunder, or (vii) the Employee's gross or willful misconduct, as determined by the Company.

5.  **Stockholder Rights.** As of the date of issuance specified at the beginning of this Agreement, the Employee shall have all of the rights of a stockholder of the Company with respect to the Restricted Shares, except as otherwise specifically provided in this Agreement.

6.  **Tax Withholding.** The parties hereto recognize that the Company or an Affiliate may be obligated to withhold federal and state taxes or other taxes upon the vesting of the Restricted Shares, or, in the event that the Employee elects under Code Section 83(b) to report the receipt of the Restricted Shares as income in the year of receipt, upon the Employee's receipt of the Restricted Shares. The Employee agrees that, at such time, if the Company or an Affiliate is required to withhold such taxes, the Employee will promptly pay, in cash upon demand (or in any other manner permitted by the Committee in accordance with the terms of the Plan), to the Company or an Affiliate such amounts as shall be necessary to satisfy such obligation. The Employee further acknowledges that the Company has directed the Employee to seek independent advice regarding the applicable provisions of the Code, the income tax laws of any municipality, state or foreign country in which the Employee may reside, and the tax consequences of the Employee's death.

7.  **Restrictive Legends and Stop-Transfer Orders.**

   (a)  **Legends.** The book entry or certificate representing the Restricted Shares shall contain a notation or bear the following legend (as well as any notations or legends required by applicable state and federal corporate and securities laws) noting the existence of the restrictions and the Company's rights to reacquire the Restricted Shares set forth in this Agreement:

   > "THE SHARES REPRESENTED BY THIS [BOOK ENTRY]
   > [CERTIFICATE] MAY BE TRANSFERRED ONLY IN
   > ACCORDANCE WITH THE TERMS OF A RESTRICTED STOCK
   > AGREEMENT BETWEEN THE COMPANY AND THE
   > STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH THE
   > SECRETARY OF THE COMPANY."

   (b)  **Stop-Transfer Notices.** The Employee agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

   (c)  **Refusal to Transfer.** The Company shall not be required (i) to transfer on its books any Restricted Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of the Restricted Shares or to

AM2003RSW

accord the right to vote or pay dividends to any purchaser or other transferee to whom the Restricted Shares shall have been so transferred.

8.    **Interpretation of This Agreement.** All decisions and interpretations made by the Committee with regard to any question arising hereunder or under the Plan shall be binding and conclusive upon the Company and the Employee. If there is any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan shall govern.

9.    **Not Part of Employment Contract; Discontinuance of Employment.** The Employee acknowledges that this Agreement awards restricted stock to the Employee, but does not impose any obligation on the Company to make any future grants or issue any future Awards to the Employee or otherwise continue the participation of the Employee under the Plan. This Agreement shall not give the Employee a right to continued employment with the Company or any Affiliate, and the Company or Affiliate employing the Employee may terminate his or her employment and otherwise deal with the Employee without regard to the effect it may have upon him or her under this Agreement.

10.    **Binding Effect.** This Agreement shall be binding in all respects on the heirs, representatives, successors and assigns of the Employee.

11.    **Choice of Law.** This Agreement is entered into under the laws of the State of Delaware and shall be construed and interpreted thereunder (without regard to its conflict-of-law principles).

12.    **Entire Agreement.** This Agreement and the Plan set forth the entire agreement and understanding of the parties hereto with respect to the issuance and sale of the Restricted Shares and the administration of the Plan and supersede all prior agreements, arrangements, plans, and understandings relating to the issuance and sale of the Restricted Shares and the administration of the Plan.

13.    **Amendment and Waiver.** Except as provided in the Plan, this Agreement may be amended, waived, modified, or canceled only by a written instrument executed by the parties or, in the case of a waiver, by the party waiving compliance.

14.    **Acknowledgment of Receipt of Copy.** By execution hereof, the Employee acknowledges having received a copy of the prospectus related to the Plan and instructions on how to access a copy of the Plan.

AM2003RSW

2.  If I have used any of the following terms on this form and I have not otherwise specifically defined that term, the term shall have the following meaning:  "issue" means all persons who are lineal descendants of the person whose issue are referred to, including legally adopted descendants and their descendants but not including illegitimate descendants and their descendants; "child" means an issue of the first generation; "per stirpes" means in equal shares among living children of the person whose issue are referred to and the issue (taken collectively) of each deceased child of such person, with such issue taking by right of representation of such deceased child; and "survive" means living after my death; provided, however, that if there is not sufficient evidence that a Beneficiary was living after my death, it shall be deemed that the Beneficiary was not living after my death.  Unless I have otherwise specified in this designation, if a Beneficiary survives me but dies before receipt of all payments due him or her under the Plan, such remaining payments shall be payable to his or her estate and not to any other Beneficiary.

3.  If I designate as a Beneficiary the person who is my spouse on the date of this designation either by name or by relationship, or both, the dissolution, annulment or other legal termination of my marriage to such person shall revoke such designation, and this form shall be interpreted as if such person did not survive me.  If I designate any other Beneficiary both by name and by relationship to me, the description of the relationship is for identification purposes only and the designation of the Beneficiary by name will be given effect without regard to whether the relationship exists now or at my death.  Any designation of a Beneficiary only by statement of relationship to me shall be effective only to designate the person or persons having such relationship to me at my death.

4.  Any previous Beneficiary designation made by me is hereby revoked.  I reserve the power to change this designation at any time by a form similar to this both signed by me and received by you prior to my death.

5.  This Beneficiary designation shall be effective only if it is both signed by me and received by you prior to my death.

| | | |
|---|---|---|
| _____ | REDACTED    8368 | 03/08/06 |
| Participant's Signature | Social Security Number | Date |

2861 Clay St.    San Francisco, CA    94115
Street    City    State    Zip

Married (Check one)    ☐ Yes  ☐ No

Please complete and return to Piper Jaffray, Attn:  Executive Compensation, 800 Nicollet Mall, J09S04, Minneapolis, MN 55402-7020

IN WITNESS WHEREOF, the Employee and the Company have executed this Agreement as of the date of issuance specified at the beginning of this Agreement.

EMPLOYEE

Charles J Moran

PIPER JAFFRAY COMPANIES

By      Andrew S. Duff
Its     Chairman and CEO

REDACTED

7

AM2003RSW

PIPER JAFFRAY COMPANIES
AMENDED AND RESTATED
2003 ANNUAL AND LONG-TERM INCENTIVE PLAN

RESTRICTED STOCK AGREEMENT

Name of Employee:   Charles J Moran

REDACTED

Date of Issuance:   February 15, 2007

Vesting Schedule pursuant to Section 2:

Vesting Date(s)
February 15, 2010

REDACTED

This is a Restricted Stock Agreement ("Agreement") between Piper Jaffray Companies, a Delaware corporation (the "Company"), and the above-named employee of the Company (the "Employee").

Recitals

WHEREAS, the Company maintains the Piper Jaffray Companies Amended and Restated 2003 Annual and Long-Term Incentive Plan, as amended from time to time (the "Plan");

WHEREAS, the Board of Directors of the Company has appointed the Compensation Committee (the "Committee") with the authority to determine the awards to be granted under the Plan; and

WHEREAS, the Committee or its delegee has determined that the Employee is eligible to receive an award under the Plan in the form of restricted stock and has set the terms thereof;

NOW, THEREFORE, the Company hereby grants this award to the Employee under the terms set by the Committee as follows.



<u>Terms and Conditions</u>*

1.     <u>Grant of Restricted Stock.</u>

(a)     Subject to the terms and conditions of this Agreement, the Company has granted to the Employee the number of Shares specified at the beginning of this Agreement.  These Shares are subject to the restrictions provided for in this Agreement and are referred to collectively as the "Restricted Shares" and each as a "Restricted Share."

(b)     The Restricted Shares will be evidenced by a book entry made in the records of the Company's transfer agent in the name of the Employee (unless the Employee requests a certificate evidencing the Restricted Shares).  All restrictions provided for in this Agreement will apply to each Restricted Share and to any other securities distributed with respect to that Restricted Share. Unless otherwise permitted by the Committee in accordance with the terms of the Plan, the Restricted Shares may not (until such Restricted Shares have vested in the Employee in accordance with all terms and conditions of this Agreement) be assigned or transferred other than by will or the laws of descent and distribution and shall not be subject to pledge, hypothecation, execution, attachment or similar process.  Each Restricted Share will remain restricted and subject to forfeiture to the Company unless and until that Restricted Share has vested in the Employee in accordance with all of the terms and conditions of this Agreement.  Each book entry (or stock certificate if requested by the Employee) evidencing any Restricted Share may contain such notations or legends and stock transfer instructions or limitations as may be determined or authorized by the Company in its sole discretion.  If a certificate evidencing any Restricted Share is requested by the Employee, the Company may, in its sole discretion, retain custody of any such certificate throughout the period during which any restrictions are in effect and require, as a condition to issuing any such certificate, that the Employee tender to the Company a stock power duly executed in blank relating to such custody.

2.     <u>Vesting.</u>

(a)     If the Employee remains continuously employed (including during the continuance of any leave of absence as approved by the Company or an Affiliate) by the Company or an Affiliate, then the Restricted Shares will vest in the numbers and on the dates specified in the Vesting Schedule at the beginning of this Agreement.

(b)     If the Employee's employment by the Company or an Affiliate terminates because of the Employee's death or long-term disability (as defined in the Company's long-term disability plan, a "Disability"), then the unvested Restricted Shares will immediately vest in full.

(c)     If the Employee's employment by the Company or an Affiliate terminates as a result of a Severance Event (as defined in the Company's Severance Plan and as determined in the

---

*     Unless the context indicates otherwise, terms that are not defined in this Agreement shall have the meaning set forth in the Plan.

AM2003RS07grant

sole discretion of the Company), then the unvested Restricted Shares will, as determined by the Committee and set forth in writing in a severance agreement, continue to vest in the numbers and on the dates specified in the Vesting Schedule at the beginning of this Agreement, so long as the Employee complies with the terms and conditions of the Severance Plan and the applicable severance agreement, including execution of a general release of all claims against the Company and any designated Affiliates and their respective agents, on a form provided by the Company for this purpose and within the timeframe designated by the Company, that becomes effective and enforceable.

(d)    If the Employee's employment with the Company or an Affiliate terminates for any reason other than for Cause (as defined below) or due to the Employee's death, Disability or as a result of a Severance Event (as set forth in paragraphs 2(b)-(c), above), then the Restricted Shares shall cease vesting and be forfeited in accordance with Section 4 of this Agreement, unless, at or around the time of such termination, the Employee voluntarily elects to sign a Post-Termination Agreement with the Company, and thereafter complies with the Employee's obligations under such agreement including the obligation to refrain from engaging in any Post-Termination Restricted Activities. "Post-Termination Restricted Activities" include each of the following:

(i)    at any time during the period set forth in the Post-Termination Agreement, the Employee uses, discloses or misappropriates any Company-Related Information (as defined below) unless the Company or an Affiliate consents otherwise in writing. "Company-Related Information" means any confidential or secret knowledge or information of the Company or an Affiliate that the Employee has acquired or become acquainted with during the Employee's employment with the Company or an Affiliate, including, without limitation, any confidential customer list, confidential business information, confidential materials relating to the practices or procedures of the Company or an Affiliate, or any other proprietary information of the Company or an Affiliate; provided, however that Company-Related Information shall not include any knowledge or information that is now published or which subsequently becomes generally publicly known in the form in which it was obtained from the Company or an Affiliate, other than as a direct or indirect result of the Employee's disclosure in contradiction of this Section 2(d);

(ii)    any time during the period set forth in the Post-Termination Agreement, the Employee directly or indirectly, on behalf of the Employee or any other person (including but not limited to a Talent Competitor (as defined below)), solicits for employment any person employed by the Company or an Affiliate who was employed by the Company or an Affiliate and with whom Employee interacted at any time within three (3) years prior to the date of the Employee's termination of employment;

(iii) any time during the period set forth in the Post-Termination Agreement, the Employee directly or indirectly, on behalf of any Talent Competitor, solicits any customer, client or account of the Company or any Affiliate, that was a customer, client or account of the Company or any Affiliate and with whom the Employee interacted at any time within three (3) years prior to the date of the Employee's termination of employment, or

AM2003RS07grant

the Employee otherwise seeks to divert any such customer, client or account away from the Company or any Affiliate; or

(iv) any time during the period set forth in the Post-Termination Agreement, without the prior written consent of the Company or an Affiliate, the Employee directly or indirectly owns, manages, operates, controls or participates in the ownership, management, operation or control of a Talent Competitor; or becomes connected as an officer, employee, partner, director, consultant, independent contractor or otherwise with a Talent Competitor; or has or acquires any financial or other pecuniary interest in any Talent Competitor. A "Talent Competitor" means any corporation, partnership, limited liability company or other business association, organization or entity or person of any kind whatsoever that engages in the investment banking, securities brokerage or investment management business, including, but not limited to, investment banks, sell-side broker dealers, mergers and acquisitions or strategic advisory firms, merchant banks, hedge funds, private equity firms, venture capital firms, asset managers and investment advisory firms. Notwithstanding the foregoing, however, ownership by the Employee, for passive personal investment purposes only, of less than 5% of the voting stock of a Talent Competitor that is any publicly held corporation shall not by itself constitute engaging in a Post-Termination Restricted Activity.

If and so long as the conditions of Paragraph 2(d) are satisfied, the Restricted Shares shall not cease to vest and be forfeited in accordance with Section 4 of this Agreement but, as set forth in the Post-Termination Agreement, shall vest in full or will continue to vest in the numbers and on the dates specified in the Vesting Schedule at the beginning of this Agreement.

(e) Notwithstanding any other provisions of this Agreement to the contrary, the Committee may in its sole discretion, declare at any time that the Restricted Shares, or any portion thereof, shall vest immediately or, to the extent they otherwise would be forfeited pursuant to the terms of this Agreement, shall vest in the numbers and on the dates specified in the Vesting Schedule at the beginning of this Agreement, or in such other numbers and on such other dates as are determined by the Committee to be in the interests of the Company as determined by the Committee in its sole discretion.

3. **Lapse of Restrictions**. Upon the vesting of any Restricted Shares, such vested Restricted Shares will no longer be subject to forfeiture as provided in Section 4 of this Agreement.

4. **Forfeiture**. If (i) the Employee attempts to pledge, encumber, assign, transfer or otherwise dispose of any of the Restricted Shares (except as permitted by Section 1(b) of this Agreement) or the Restricted Shares become subject to attachment or any similar involuntary process in violation of this Agreement, or (ii) the Employee's employment with the Company or an Affiliate (A) is terminated for Cause or (B) terminates under the circumstances covered by Section 2(c) or Section 2(d) of this Agreement and either (1) the conditions or restrictions of such Section, as applicable, are not satisfied or (2) the conditions or restrictions of such Section, as applicable, are satisfied but the Employee subsequently violates any of them, then any Restricted Shares that have not previously vested shall be forfeited by the Employee to the Company, the Employee shall

4

AM2003RS07grant

thereafter have no right, title or interest whatever in such Restricted Shares, and, if the Company does not have custody of any and all certificates representing Restricted Shares so forfeited, the Employee shall immediately return to the Company any and all certificates representing Restricted Shares so forfeited. Additionally, the Employee will deliver to the Company a stock power duly executed in blank relating to any and all certificates representing Restricted Shares forfeited to the Company in accordance with the previous sentence or, if such stock power has previously been tendered to the Company, the Company will be authorized to deem such previously tendered stock power delivered, and the Company will be authorized to cancel any and all certificates representing Restricted Shares so forfeited and to cause a book entry to be made in the records of the Company's transfer agent in the name of the Employee (or a new stock certificate to be issued, if requested by the Employee) evidencing any Shares that vested prior to forfeiture. If the Restricted Shares are evidenced by a book entry made in the records of the Company's transfer agent, then the Company will be authorized to cause such book entry to be adjusted to reflect the number of Restricted Shares so forfeited. "Cause" means (i) the Employee's continued failure to substantially perform his or her duties with the Company or an Affiliate after written demand for substantial performance is delivered to the Employee, (ii) the Employee's conviction of a crime (including misdemeanors) that, in the Company's determination, impairs the Employee's ability to perform his or her duties with the Company or an Affiliate, (iii) the Employee's violation of any policy of the Company or an Affiliate that the Company deems material, (iv) the Employee's violation of any securities law, rule or regulation that the Company deems material, (v) the Employee's engagement in conduct that, in the Company's determination, exposes the Company or an Affiliate to civil or regulatory liability or injury to their reputations, (vi) the Employee's engagement in conduct that would subject the Employee to statutory disqualification pursuant to Section 15(b) of the Exchange Act and the regulations promulgated thereunder, or (vii) the Employee's gross or willful misconduct, as determined by the Company.

5.    **Stockholder Rights**. As of the date of issuance specified at the beginning of this Agreement, the Employee shall have all of the rights of a stockholder of the Company with respect to the Restricted Shares, except as otherwise specifically provided in this Agreement.

6.    **Tax Withholding**. The parties hereto recognize that the Company or an Affiliate may be obligated to withhold federal and state taxes or other taxes upon the vesting of the Restricted Shares, or, in the event that the Employee elects under Code Section 83(b) to report the receipt of the Restricted Shares as income in the year of receipt, upon the Employee's receipt of the Restricted Shares. The Employee agrees that, at such time, if the Company or an Affiliate is required to withhold such taxes, the Employee will promptly pay, in cash upon demand (or in any other manner permitted by the Committee in accordance with the terms of the Plan), to the Company or an Affiliate such amounts as shall be necessary to satisfy such obligation. The Employee further acknowledges that the Company has directed the Employee to seek independent advice regarding the applicable provisions of the Code, the income tax laws of any municipality, state or foreign country in which the Employee may reside, and the tax consequences of the Employee's death.

AM2003RS07grant

7.    <u>Restrictive Legends and Stop-Transfer Orders</u>.

     (a)    <u>Legends</u>. The book entry or certificate representing the Restricted Shares shall contain a notation or bear the following legend (as well as any notations or legends required by applicable state and federal corporate and securities laws) noting the existence of the restrictions and the Company's rights to reacquire the Restricted Shares set forth in this Agreement:

          "THE SHARES REPRESENTED BY THIS [BOOK ENTRY] [CERTIFICATE] MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF A RESTRICTED STOCK AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY."

     (b)    <u>Stop-Transfer Notices</u>. The Employee agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

     (c)    <u>Refusal to Transfer</u>. The Company shall not be required (i) to transfer on its books any Restricted Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of the Restricted Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom the Restricted Shares shall have been so transferred.

8.    <u>Interpretation of This Agreement</u>. All decisions and interpretations made by the Committee with regard to any question arising hereunder or under the Plan shall be binding and conclusive upon the Company and the Employee. If there is any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan shall govern.

9.    <u>Not Part of Employment Contract; Discontinuance of Employment</u>. The Employee acknowledges that this Agreement awards restricted stock to the Employee, but does not impose any obligation on the Company to make any future grants or issue any future Awards to the Employee or otherwise continue the participation of the Employee under the Plan. This Agreement shall not give the Employee a right to continued employment with the Company or any Affiliate, and the Company or Affiliate employing the Employee may terminate his or her employment and otherwise deal with the Employee without regard to the effect it may have upon him or her under this Agreement.

10.    <u>Binding Effect</u>. This Agreement shall be binding in all respects on the heirs, representatives, successors and assigns of the Employee.

11.    <u>Choice of Law</u>. This Agreement is entered into under the laws of the State of Delaware and shall be construed and interpreted thereunder (without regard to its conflict-of-law principles).

AM2003RS07grant

11.    <u>Choice of Law</u>.  This Agreement is entered into under the laws of the State of Delaware and shall be construed and interpreted thereunder (without regard to its conflict-of-law principles).

12.    <u>Entire Agreement</u>.  This Agreement and the Plan set forth the entire agreement and understanding of the parties hereto with respect to the issuance and sale of the Restricted Shares and the administration of the Plan and supersede all prior agreements, arrangements, plans, and understandings relating to the issuance and sale of the Restricted Shares and the administration of the Plan.

13.    <u>Amendment and Waiver</u>.  Except as provided in the Plan, this Agreement may be amended, waived, modified, or canceled only by a written instrument executed by the parties or, in the case of a waiver, by the party waiving compliance.

14.    <u>Acknowledgment of Receipt of Copy</u>.  By execution hereof, the Employee acknowledges having received a copy of the prospectus related to the Plan and instructions on how to access a copy of the Plan.

IN WITNESS WHEREOF, the Employee and the Company have executed this Agreement as of the date of issuance specified at the beginning of this Agreement.

EMPLOYEE

Charles J Moran

PIPER JAFFRAY COMPANIES

By      Andrew S. Duff

Its      Chairman and CEO

REDACTED

7

AM2003RS07grant

## PIPER JAFFRAY COMPANIES
### AMENDED AND RESTATED
### 2003 ANNUAL AND LONG-TERM INCENTIVE PLAN

### RESTRICTED STOCK AGREEMENT

| Name of Employee: | Charles J. Moran | |
|---|---|---|
| REDACTED | | Date of Issuance:    May 15, 2008 |

Vesting Schedule pursuant to Section 2:

| <u>Vesting Date(s)</u><br>May 15, 2011 | REDACTED |
|---|---|

This is a Restricted Stock Agreement ("Agreement") between Piper Jaffray Companies, a Delaware corporation (the "Company"), and the above-named employee of the Company (the "Employee").

### Recitals

WHEREAS, the Company maintains the Piper Jaffray Companies Amended and Restated 2003 Annual and Long-Term Incentive Plan, as amended from time to time (the "Plan");

WHEREAS, the Board of Directors of the Company has appointed the Compensation Committee (the "Committee") with the authority to determine the awards to be granted under the Plan; and

WHEREAS, the Committee or its delegee has determined that the Employee is eligible to receive an award under the Plan in the form of restricted stock and has set the terms thereof;

NOW, THEREFORE, the Company hereby grants this award to the Employee under the terms set by the Committee as follows.



<u>Terms and Conditions</u>*

1.    <u>Grant of Restricted Stock</u>.

(a)    Subject to the terms and conditions of this Agreement, the Company has granted to the Employee the number of Shares specified at the beginning of this Agreement. These Shares are subject to the restrictions provided for in this Agreement and are referred to collectively as the "Restricted Shares" and each as a "Restricted Share."

(b)    The Restricted Shares will be evidenced by a book entry made in the records of the Company's transfer agent in the name of the Employee (unless the Employee requests a certificate evidencing the Restricted Shares). All restrictions provided for in this Agreement will apply to each Restricted Share and to any other securities distributed with respect to that Restricted Share. Unless otherwise permitted by the Committee in accordance with the terms of the Plan, the Restricted Shares may not (until such Restricted Shares have vested in the Employee in accordance with all terms and conditions of this Agreement) be assigned or transferred other than by will or the laws of descent and distribution and shall not be subject to pledge, hypothecation, execution, attachment or similar process. Each Restricted Share will remain restricted and subject to forfeiture to the Company unless and until that Restricted Share has vested in the Employee in accordance with all of the terms and conditions of this Agreement. Each book entry (or stock certificate if requested by the Employee) evidencing any Restricted Share may contain such notations or legends and stock transfer instructions or limitations as may be determined or authorized by the Company in its sole discretion. If a certificate evidencing any Restricted Share is requested by the Employee, the Company may, in its sole discretion, retain custody of any such certificate throughout the period during which any restrictions are in effect and require, as a condition to issuing any such certificate, that the Employee tender to the Company a stock power duly executed in blank relating to such custody.

2.    <u>Vesting</u>.

(a)    If the Employee remains continuously employed (including during the continuance of any leave of absence as approved by the Company or an Affiliate) by the Company or an Affiliate, then the Restricted Shares will vest in the numbers and on the dates specified in the Vesting Schedule at the beginning of this Agreement.

(b)    If the Employee's employment by the Company or an Affiliate terminates because of the Employee's death or long-term disability (as defined in the Company's long-term disability plan, a "Disability"), then the unvested Restricted Shares will immediately vest in full.

(c)    If the Employee's employment by the Company or an Affiliate terminates as a result of a Severance Event (as defined in the Company's Severance Plan and as determined in the

_____

*    Unless the context indicates otherwise, terms that are not defined in this Agreement shall have the meaning set forth in the Plan.

2

sole discretion of the Company), then the unvested Restricted Shares will, as determined by the Committee and set forth in writing in a severance agreement, continue to vest in the numbers and on the dates specified in the Vesting Schedule at the beginning of this Agreement, so long as the Employee complies with the terms and conditions of the Severance Plan and the applicable severance agreement, including execution of a general release of all claims against the Company and any designated Affiliates and their respective agents, on a form provided by the Company for this purpose and within the timeframe designated by the Company, that becomes effective and enforceable.

(d)    If the Employee's employment with the Company or an Affiliate terminates for any reason other than for Cause (as defined below) or due to the Employee's death, Disability or as a result of a Severance Event (as set forth in paragraphs 2(b)-(c), above), then the Restricted Shares shall cease vesting and be forfeited in accordance with Section 4 of this Agreement, unless, at or around the time of such termination, the Employee voluntarily elects to sign a Post-Termination Agreement with the Company, and thereafter complies with the Employee's obligations under such agreement including the obligation to refrain from engaging in any Post-Termination Restricted Activities. "Post-Termination Restricted Activities" include each of the following:

(i)    at any time during the period set forth in the Post-Termination Agreement, the Employee uses, discloses or misappropriates any Company-Related Information (as defined below) unless the Company or an Affiliate consents otherwise in writing. "Company-Related Information" means any confidential or secret knowledge or information of the Company or an Affiliate that the Employee has acquired or become acquainted with during the Employee's employment with the Company or an Affiliate, including, without limitation, any confidential customer list, confidential business information, confidential materials relating to the practices or procedures of the Company or an Affiliate, or any other proprietary information of the Company or an Affiliate; provided, however that Company-Related Information shall not include any knowledge or information that is now published or which subsequently becomes generally published or which subsequently becomes publicly known in the form in which it was obtained from the Company or an Affiliate, other than as a direct or indirect result of the Employee's disclosure in contradiction of this Section 2(d);

(ii)    any time during the period set forth in the Post-Termination Agreement, the Employee directly or indirectly, on behalf of the Employee or any other person (including but not limited to a Talent Competitor (as defined below)), solicits for employment any person employed by the Company or an Affiliate who was employed by the Company or an Affiliate and with whom Employee interacted at any time within three (3) years prior to the date of the Employee's termination of employment;

(iii)any time during the period set forth in the Post-Termination Agreement, the Employee directly or indirectly, on behalf of any Talent Competitor, solicits any customer, client or account of the Company or any Affiliate, that was a customer, client or account of the Company or any Affiliate and with whom the Employee interacted at

3

any time within three (3) years prior to the date of the Employee's termination of employment, or the Employee otherwise seeks to divert any such customer, client or account away from the Company or any Affiliate; or

(iv)    any time during the period set forth in the Post-Termination Agreement, without the prior written consent of the Company or an Affiliate, the Employee directly or indirectly owns, manages, operates, controls or participates in the ownership, management, operation or control of a Talent Competitor; or becomes connected as an officer, employee, partner, director, consultant, independent contractor or otherwise with a Talent Competitor; or has or acquires any financial or other pecuniary interest in any Talent Competitor. A "Talent Competitor" means any corporation, partnership, limited liability company or other business association, organization or entity or person of any kind whatsoever that engages in the investment banking, securities brokerage or investment management business, including, but not limited to, investment banks, sell-side broker dealers, mergers and acquisitions or strategic advisory firms, merchant banks, hedge funds, private equity firms, venture capital firms, asset managers and investment advisory firms. Notwithstanding the foregoing, however, ownership by the Employee, for passive personal investment purposes only, of less than 5% of the voting stock of a Talent Competitor that is any publicly held corporation shall not by itself constitute engaging in a Post-Termination Restricted Activity.

If and so long as the conditions of Paragraph 2(d) are satisfied, the Restricted Shares shall not cease to vest and be forfeited in accordance with Section 4 of this Agreement but, as set forth in the Post-Termination Agreement, shall vest in full or will continue to vest in the numbers and on the dates specified in the Vesting Schedule at the beginning of this Agreement.

(e)    Notwithstanding any other provisions of this Agreement to the contrary, the Committee may in its sole discretion, declare at any time that the Restricted Shares, or any portion thereof, shall vest immediately or, to the extent they otherwise would be forfeited pursuant to the terms of this Agreement, shall vest in the numbers and on the dates specified in the Vesting Schedule at the beginning of this Agreement, or in such other numbers and on such other dates as are determined by the Committee to be in the interests of the Company as determined by the Committee in its sole discretion.

3.    <u>Lapse of Restrictions</u>. Upon the vesting of any Restricted Shares, such vested Restricted Shares will no longer be subject to forfeiture as provided in Section 4 of this Agreement.

4.    <u>Forfeiture</u>. If (i) the Employee attempts to pledge, encumber, assign, transfer or otherwise dispose of any of the Restricted Shares (except as permitted by Section 1(b) of this Agreement) or the Restricted Shares become subject to attachment or any similar involuntary process in violation of this Agreement, or (ii) the Employee's employment with the Company or an Affiliate (A) is terminated for Cause or (B) terminates under the circumstances covered by Section 2(c) or Section 2(d) of this Agreement and either (1) the conditions or restrictions of such Section, as applicable, are not satisfied or (2) the conditions or restrictions of such Section, as applicable, are satisfied but the Employee subsequently violates any of them, then any Restricted

4

Shares that have not previously vested shall be forfeited by the Employee to the Company, the Employee shall thereafter have no right, title or interest whatever in such Restricted Shares, and, if the Company does not have custody of any and all certificates representing Restricted Shares so forfeited, the Employee shall immediately return to the Company any and all certificates representing Restricted Shares so forfeited. Additionally, the Employee will deliver to the Company a stock power duly executed in blank relating to any and all certificates representing Restricted Shares forfeited to the Company in accordance with the previous sentence or, if such stock power has previously been tendered to the Company, the Company will be authorized to deem such previously tendered stock power delivered, and the Company will be authorized to cancel any and all certificates representing Restricted Shares so forfeited and to cause a book entry to be made in the records of the Company's transfer agent in the name of the Employee (or a new stock certificate to be issued, if requested by the Employee) evidencing any Shares that vested prior to forfeiture. If the Restricted Shares are evidenced by a book entry made in the records of the Company's transfer agent, then the Company will be authorized to cause such book entry to be adjusted to reflect the number of Restricted Shares so forfeited. "Cause" means (i) the Employee's continued failure to substantially perform his or her duties with the Company or an Affiliate after written demand for substantial performance is delivered to the Employee, (ii) the Employee's conviction of a crime (including misdemeanors) that, in the Company's determination, impairs the Employee's ability to perform his or her duties with the Company or an Affiliate, (iii) the Employee's violation of any policy of the Company or an Affiliate that the Company deems material, (iv) the Employee's violation of any securities law, rule or regulation that the Company deems material, (v) the Employee's engagement in conduct that, in the Company's determination, exposes the Company or an Affiliate to civil or regulatory liability or injury to their reputations, (vi) the Employee's engagement in conduct that would subject the Employee to statutory disqualification pursuant to Section 15(b) of the Exchange Act and the regulations promulgated thereunder, or (vii) the Employee's gross or willful misconduct, as determined by the Company.

5.     **Stockholder Rights.** As of the date of issuance specified at the beginning of this Agreement, the Employee shall have all of the rights of a stockholder of the Company with respect to the Restricted Shares, except as otherwise specifically provided in this Agreement.

6.     **Tax Withholding.** The parties hereto recognize that the Company or an Affiliate may be obligated to withhold federal and state taxes or other taxes upon the vesting of the Restricted Shares, or, in the event that the Employee elects under Code Section 83(b) to report the receipt of the Restricted Shares as income in the year of receipt, upon the Employee's receipt of the Restricted Shares. The Employee agrees that, at such time, if the Company or an Affiliate is required to withhold such taxes, the Employee will promptly pay, in cash upon demand (or in any other manner permitted by the Committee in accordance with the terms of the Plan), to the Company or an Affiliate such amounts as shall be necessary to satisfy such obligation. The Employee further acknowledges that the Company has directed the Employee to seek independent advice regarding the applicable provisions of the Code, the income tax laws of any municipality, state or foreign country in which the Employee may reside, and the tax consequences of the Employee's death.

AM2003RS08grant

7.   Restrictive Legends and Stop-Transfer Orders.

   (a)   Legends.  The book entry or certificate representing the Restricted Shares shall contain a notation or bear the following legend (as well as any notations or legends required by applicable state and federal corporate and securities laws) noting the existence of the restrictions and the Company's rights to reacquire the Restricted Shares set forth in this Agreement:

> "THE SHARES REPRESENTED BY THIS [BOOK ENTRY] [CERTIFICATE] MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF A RESTRICTED STOCK AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY."

   (b)   Stop-Transfer Notices.  The Employee agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

   (c)   Refusal to Transfer.  The Company shall not be required (i) to transfer on its books any Restricted Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of the Restricted Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom the Restricted Shares shall have been so transferred.

8.   Interpretation of This Agreement.  All decisions and interpretations made by the Committee with regard to any question arising hereunder or under the Plan shall be binding and conclusive upon the Company and the Employee.  If there is any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan shall govern.

9.   Not Part of Employment Contract; Discontinuance of Employment.  The Employee acknowledges that this Agreement awards restricted stock to the Employee, but does not impose any obligation on the Company to make any future grants or issue any future Awards to the Employee or otherwise continue the participation of the Employee under the Plan.  This Agreement shall not give the Employee a right to continued employment with the Company or any Affiliate, and the Company or Affiliate employing the Employee may terminate his or her employment and otherwise deal with the Employee without regard to the effect it may have upon him or her under this Agreement.

10.   Binding Effect.  This Agreement shall be binding in all respects on the heirs, representatives, successors and assigns of the Employee.

AM2003RS08grant

11.    <u>Choice of Law</u>.  This Agreement is entered into under the laws of the State of Delaware and shall be construed and interpreted thereunder (without regard to its conflict-of-law principles).

12.    <u>Entire Agreement</u>.  This Agreement and the Plan set forth the entire agreement and understanding of the parties hereto with respect to the issuance and sale of the Restricted Shares and the administration of the Plan and supersede all prior agreements, arrangements, plans, and understandings relating to the issuance and sale of the Restricted Shares and the administration of the Plan.

13.    <u>Amendment and Waiver</u>.  Except as provided in the Plan, this Agreement may be amended, waived, modified, or canceled only by a written instrument executed by the parties or, in the case of a waiver, by the party waiving compliance.

14.    <u>Acknowledgment of Receipt of Copy</u>.  By execution hereof, the Employee acknowledges having received a copy of the prospectus related to the Plan and instructions on how to access a copy of the Plan.

IN WITNESS WHEREOF, the Employee and the Company have executed this Agreement as of the date of issuance specified at the beginning of this Agreement.

EMPLOYEE

Charles J. Moran

PIPER JAFFRAY COMPANIES

By    Andrew S. Duff
Its   Chairman and CEO

REDACTED

7

AM2003RS08grant