1  GORDON YOUNG, CASB NO. 158100
   Gordon.young@kyl.com
2  JULIE A. KOLE, CASB NO. 203681
   Julie.kole@kyl.com
3  ANNE MORIARTY, CASB No. 251803
   Annie.moriarty@kyl.com
4  KEESAL, YOUNG & LOGAN
   A Professional Corporation
5  Four Embarcadero Center, Suite 1500
   San Francisco, California 94111
6  Telephone:  (415) 398-6000
   Facsimile:   (415) 981-0136
7
   Attorneys for Defendant
8  PIPER JAFFRAY & CO.

9

10              **UNITED STATES DISTRICT COURT**

11             **NORTHERN DISTRICT OF CALIFORNIA**

12

13

14  CHARLES JASON MORAN,                    )  Case No. CV 08-3188 JL
                                            )
15                         Plaintiff,       )
                                            )  **SUPPLEMENTAL DECLARATION OF**
16          vs.                             )  **ANNE MORIARTY IN SUPPORT OF**
                                            )  **DEFENDANT PIPER JAFFRAY &**
17  PIPER JAFFRAY & CO., d/b/a PIPER        )  **CO.'S (1) PETITION TO COMPEL**
    JAFFRAY,                                )  **ARBITRATION; AND (2) MOTION TO**
18                                          )  **STAY PROCEEDINGS**
                           Defendant.       )
19                                          )  **Date:       August 22, 2008**
                                            )  **Time:       9:00 a.m.**
20                                          )  **Place:      Department 2, 17th Floor**
                                            )  **Judge:      The Hon. Jeffrey S. White**
21                                          )
                                            )
22                                          )
                                            )
23                                          )
                                            )
24                                          )
                                            )
25                                          )
                                            )
26  _____)

27

28

SUPPLEMENTAL DECLARATION OF ANNE MORIARTY IN SUPPORT OF DEFENDANT'S (1)
PETITION TO COMPEL ARBITRATION AND (2) MOTION TO STAY PROCEEDINGS -- CV 08-3188 JL

I, Anne Moriarty, declare as follows:

1.    I am an associate of the law firm of Keesal, Young & Logan, attorneys of record herein for Defendant PIPER JAFFRAY & CO. in the above-entitled action.   I have personal knowledge of the contents of this Declaration and I could and would competently testify thereto if called to do so.

2.    On June 19, 2008, Plaintiff filed his Complaint for Declaratory Relief and Motion for Preliminary Injunction in San Francisco Superior Court against Piper Jaffray.

3.    On June 2, 2008, Defendant filed its Notice of Removal, removing the case to this Court.

4.    On June 3, 2008, Defendant filed its Petition to Compel Arbitration and Motion to Stay proceedings.

5.    On July 16, 2008, Defendant received Plaintiff's Statement of Claim ("SOC") which he filed with the Financial Industry Regulatory Authority.   Attached hereto as Exhibit "1" is a true and correct copy of Plaintiff's SOC.

6.    On July 17, 2008, Plaintiff then filed his Motion for Preliminary Injunction in this Court.

7.    The hearing on Plaintiff's Motion for Preliminary Injunction is set for October 10, 2008.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 24, 2008, in the City and County of San Francisco, California.

_____
ANNE MORIARTY

KYL_SF464632

SUPPLEMENTAL DECLARATION OF ANNE MORIARTY IN SUPPORT OF DEFENDANT'S (1)
PETITION TO COMPEL ARBITRATION AND (2) MOTION TO STAY PROCEEDINGS -- CV 08-3188 JL

EXHIBIT "1"

the **Voice** for employees

**Nichols Kaster & Anderson, LLP**

```
┌─────────────────────────────┐
│        RECEIVED             │
│  ┌───────────────────────┐  │
│  │     JUL 1 6 2008       │  │
│  └───────────────────────┘  │
│  KEESAL, YOUNG & LOGAN      │
└─────────────────────────────┘
```

July 15, 2008

FINRA Dispute Resolution
One Liberty Plaza
165 Broadway, 27th Floor
New York, NY 10006

### Re: Charles Jason Moran v. Piper Jaffray & Co., d/b/a Piper Jaffray

To Whom It May Concern:

Attached for FINRA arbitration, please find:

1) An original and four copies of Claimant's Claim Information Sheet and Uniform Submission Agreement;
2) An original and four copies of Claimant's statement of claims; and
3) Claimant's filing fee check in the amount of $3,000

Please take note that, pursuant to FINRA Code of Arbitration Procedure for Industry Disputes § 13804, Claimant has a request for preliminary injunction pending in the United States District Court for the Northern District of California, case number 08-cv-3188 (JSW). Claimant anticipates that his motion for preliminary injunction will be heard August 22, 2008.

Sincerely,

NICHOLS KASTER & ANDERSON, LLP

Matthew C. Helland

cc:     Gordon Young, Esq.
        Julie Kole, Esq.
        Anne Moriarty, Esq.

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**

**ARBITRATION**

In the Matter of the Arbitration between:

Charles Jason Moran,

Claimant,

v.

Piper Jaffray & Co.,
d/b/a Piper Jaffray,

Respondents.

RECEIVED

JUL 1 6 2008

KEESAL, YOUNG & LOGAN

**STATEMENT OF CLAIMS**

FINRA Arb No. _____

## INTRODUCTION

1.      This arbitration is brought to recover damages sustained by Charles Jason Moran ("Moran") as a result of the wrongful discharge in violation of public policy, wrongful withholding of pay in violation of public policy, and breach of contract, which he suffered at the hands of his former employer, Piper Jaffray & Co., d/b/a Piper Jaffray, as well as to obtain declaratory relief.

## PARTIES

2.      Claimant Moran resides in San Francisco, California (San Francisco County), where he was employed by Piper Jaffray & Co., d/b/a Piper Jaffray.

3.      Respondent, Piper Jaffray & Co., d/b/a Piper Jaffray ("Piper Jaffray") is a Delaware corporation, with its headquarters in Minneapolis, Minnesota. Piper Jaffray is a member of the Financial Industry Regulatory Authority ("FINRA"), which was created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc. ("NASD")

and the member regulation, enforcement and arbitration functions of the New York Stock Exchange ("NYSE").

## FACTS

### Moran's Employment with Piper Jaffray

4.    Moran began working for Piper Jaffray on or about April 19, 1999 as an Associate in the Health Care Investment Banking Group. Moran's work focused primarily in the biopharmaceutical, medical technology and diagnostic areas.

5.    Moran was a top performer for Piper Jaffray. He received multiple promotions throughout his 9-year tenure with the company. In 2001, Piper Jaffray promoted Moran to Vice President. In 2004, Piper Jaffray promoted Moran to Principal. In 2007, Piper Jaffray promoted Moran again, to Managing Director. Moran's promotion to Managing Director came one year ahead of schedule because of his superior performance.

6.    Moran generated significant revenue for Piper Jaffray. "Attributable revenue" is a primary metric for evaluating senior bankers at Piper Jaffray. As calculated by Piper Jaffray, Moran had approximately $7 million of attributable revenue in 2006 and approximately $9.4 million of attributable revenue in 2007. At Piper Jaffray, attributable revenue expectations for senior bankers are typically between $5 million and $7 million. As such, Moran produced at or above the level expected of him in his position.

7.    Moran's employment with Piper Jaffray ended on April 14, 2008, as a result of a termination decision Piper Jaffray communicated to Moran on February 11, 2008. As outlined below, this termination was wrongful and in violation of public policy.

## The Global Settlement Agreement

8.      In April 2003, the Securities and Exchange Commission ("SEC") settled charges against Piper Jaffray which arose from an investigation into research analyst conflicts of interest (the "Global Settlement Agreement"). The charges alleged that Piper Jaffray improperly allowed investment bankers to influence research analysts' product ratings, in order to enhance the value of the investment bankers' products and build investment banking relationships.   The charges further alleged that Piper Jaffray's actions violated the Securities Act of 1933, 15 U.S.C. § 77a, et. seq., and NASD rules regarding member conduct, required disclosures, managing of conflicts of interests, advertising, and supervision of NASD members.   Parties to the Global Settlement Agreement included nine other brokerage firms, the NASD, the NYSE, the North American Securities Administrators Association ("NASAA"), the New York Attorney General, and other state regulators.

9.      The Global Settlement Agreement was intended to bolster the integrity of securities research to ensure a fair and equitable securities market by addressing inappropriate influence by investment bankers over their company's research analysts, which allegedly violated NASD Rules and the Securities Act of 1933.

10.      As one of the solutions to the conflicts of interest between a firm's investment bankers and research analysts, the Global Settlement Agreement required securities firms to create a "Chinese wall" between their research and investment banking departments.

11.      Piper Jaffray was one of the ten investment firms party to the Global Settlement Agreement.   Piper Jaffray paid a fine of $32.5 million. Piper Jaffray agreed to reform its practices to ensure a fair and equitable securities market, including the implementation of the Chinese wall between research and investment banking

3

12.    Some of the terms of the Global Settlement Agreement have been adopted as FINRA Rules.

13.    As an investment banker working in the industry, Moran was aware of the Global Settlement Agreement and the conduct it, along with the underlying laws and rules, prohibited.

### The Sangamo Incident

14.    From November 27-29, 2007, Piper Jaffray hosted its yearly Health Care Conference in New York.  The conference is sponsored by Piper Jaffray's research department, but investment bankers are permitted to meet one-on-one with attending companies.

15.    On November 28, 2007, representatives from Piper Jaffray's investment banking and capital markets divisions met with representatives from Sangamo Biosciences, Inc. ("Sangamo"), a company attending the conference.  Present at the meeting from Piper Jaffray were Stuart Duty, Co-Head of Health Care Investment Banking ("Duty"), Chad Abraham, Head of Capital Markets ("Abraham"), David Stadinksi, Head of PIPEs and Registered Directs ("Stadinski"), and Moran.

16.    During the meeting, representatives from Sangamo said they had learned of instances in which a Piper Jaffray research analyst, Edward Tentoff ("Tentoff"), told selected institutional investors to sell Sangamo stock because it was overvalued. At the same time, the Sangamo representatives alleged that Tentoff publicly maintained a "buy" rating in his written research reports causing unbalanced disclosure to investors. The Sangamo representatives further indicated that Piper Jaffray orchestrated these actions in an attempt to maintain Sangamo's investment banking business.

17.    Immediately after the meeting, Moran informed Duty of his belief that Piper Jaffray's actions in this matter constituted behavior prohibited by the Global Settlement

4

Agreement. Duty instructed Moran "not to say anything to anyone about this" and that "he would handle this."

18.    Approximately one hour after the meeting, Tentoff posted a written research report on Piper Jaffray's website that was subsequently distributed to investors. The report mentioned that Sangamo's recent stock price decline offered "an attractive buying opportunity." This report was forwarded via e-mail, in an unusual fashion, by Abraham on November 29, 2007, to Duty, Stadinski and Moran.

19.    On December 20, 2007, Duty gave Moran his yearly performance review at the firm's San Francisco office. During that meeting, Moran again informed Duty of his belief that Piper Jaffray had engaged in behavior prohibited by the Global Settlement Agreement. Duty responded by telling Moran that he was "messing with fire" and that his job "would be in jeopardy" if he continued asking questions about Sangamo as it was "above [his] pay grade."

### Piper Jaffray's Retaliation

20.    The performance review that Duty gave Moran on December 20, 2007 contained lower scores than Moran had received in previous years. It did not accurately reflect Moran's performance.

21.    On February 11, 2008, Duty met with Moran at the firm's New York office. During that meeting, Duty communicated Moran's 2007 bonus information to him.

22.    Duty informed Moran that he would be paid a total of $824,000 for his work in 2007. This was the minimum amount Piper Jaffray was obligated to pay Moran, based on his June 2006 retention letter (attached as Exhibit D).[1] This amount was to be paid in a combination of cash ($560,000) and restricted stock ($264,000). Given his performance in 2007, Moran had

---

[1] The additional $24,000 in compensation due Moran, above the $800,000 listed in the retention letter, resulted from Moran's subscription to an "Enhanced Equity Program" designed to increase employee stock ownership in Piper Jaffray.

reasonably expected that his compensation would be substantially greater than the amount Duty said he would receive.

23.     In 2006, Piper Jaffray paid Moran approximately $950,000 in total compensation based on approximately $7 million of attributable revenue.  By contrast, Moran had approximately $9.4 million of attributable revenue in 2007, but Duty indicated that Moran would be paid $824,000 in total compensation. Thus, Moran's attributable revenue increased approximately 35% from 2006 to 2007, but his indicated compensation decreased approximately 13% over the same period.

24.     Immediately after providing Moran with his 2007 compensation information, Duty handed Moran a memorandum (the "February 11 Memorandum," attached as Exhibit E) terminating Moran's employment with Piper Jaffray.  Moran told Duty he believed he was being terminated in retaliation for reporting the Sangamo Incident as a violation of the Global Settlement Agreement.  Duty responded by saying, "No one will believe you.  It's your word against mine and I have Tom Schnettler [Vice Chairman & CFO] on my side."

25.     According to the February 11 Memorandum, Moran was to stay on the Piper Jaffray payroll until April 15, 2008 in order to transition business.  The memorandum indicated that Moran was subject to immediate separation if he failed to meet certain conditions over the following two months.  The memorandum also indicated that Piper Jaffray would code Moran's U5 as "permitted to resign", an unfavorable code, if he left his employment prior to April 15. If Moran remained with the company until April 15, the memorandum indicated his U5 would be coded as "discharged", an even more unfavorable code.

26.     On February 15, 2008, Piper Jaffray issued restricted stock awards to employees as part of their 2007 compensation. Piper Jaffray did not issue a stock award to Moran. Moran's

6

June 2006 retention letter states that his stock grant "will be payable and/or made at such time that Piper Jaffray pays its bonus compensation and makes its equity grants with respect to 2007 performance." Piper Jaffray did not issue the restricted stock to Moran until May 15, 2008.

27.    In the days and weeks following February 11, 2008, Piper Jaffray required Moran to participate in a company "investigation" regarding the alleged violations of the Global Settlement Agreement without the presence of his own counsel, despite his repeated requests to have counsel present.   On February 29, Piper Jaffray counsel informed Moran that he had completely discharged his obligation to participate in the company's investigation.

28.    Armed with the threat of moving up his termination date and immediately coding his U5 as terminated, Piper Jaffray later informed Moran that they were requiring him to participate in another investigative interview.  Moran complied, flying to Chicago on March 18, 2008 for the interview.  This interview progressed far beyond an investigation into alleged violations of the Global Settlement Agreement and into an examination of Moran's potential employment claims.

29.    On or about April 4, 2008, Piper Jaffray disabled Moran's office access card and his access to company computer systems.

30.    Moran's last day of employment with Piper Jaffray was April 14, 2008.

### The Restricted Stock Agreements

31.    As a part of his compensation with Piper Jaffray, Moran received restricted shares of Piper Jaffray stock.  In conjunction with receipt of that stock, Moran entered into Restricted Stock Agreements.

32.    Moran received a grant of stock in 2006.  He entered into a Restricted Stock Agreement in connection with that grant ("the 2006 Agreement").  A true and correct copy of

7

that agreement is attached hereto as Exhibit A.

33.    Moran received subsequent grants of stock in 2007 and 2008, entering into Restricted Stock Agreements each year ("the 2007 Agreement" and "the 2008 Agreement," collectively with the 2006 Agreement, "The Agreements"). The 2007 and 2008 Agreements varied slightly from the 2006 Agreement. True and correct copies of the 2007 and 2008 Agreements are attached hereto as Exhibits B and C, respectively.

34.    The Agreements explain how and when employee stock shares will vest and the restrictions accompanying the shares.

35.    The 2006 Agreement contains a non-compete agreement and a non-solicitation agreement giving Piper Jaffray the right to cancel Moran's shares if violated.

36.    The 2007 and 2008 Agreements dictate that, upon leaving the company, Moran is required to sign a Post-Termination Agreement with Piper Jaffray in order to prevent his restricted stock shares from forfeiting (the "Contemplated Post-Termination Agreement"). The Contemplated Post-Termination Agreement includes a non-compete provision and a non-solicitation provision.

37.    Both the non-compete provision in the 2006 Agreement, and the Contemplated Post-Termination Agreement in the 2007 and 2008 Agreements, would prevent Moran from engaging in a lawful profession, namely, his field of investment banking.

38.    Pursuant to FINRA Code of Arbitration Procedure for Industry Disputes § 13804, Moran filed a cause of action in California Superior Court, and in that action requested preliminary injunctive relief enjoining Defendant from enforcing the Agreements against him. The action has since been removed to the United States District Court for the Northern District of California, and is case number CV 08-3188 (JSW).

## COUNT I

### Wrongful Discharge In Violation of Public Policy

39.    Claimant incorporates the preceding paragraphs as if set forth herein in full.

40.    Moran reported a suspected violation of the Global Settlement Agreement.

41.    The Global Settlement Agreement, which articulates the application of NASD/FINRA Rules and the Securities Act of 1933, 15 U.S.C. § 77a, et. seq., embodies a fundamental policy against unfair, unethical, and illegal practices in the securities industry. This fundamental policy benefits the public by ensuring a fair and equitable securities market.

42.    Piper Jaffray discharged Moran from his employment in retaliation for his reports of violations of the Global Settlement Agreement. This discharge was tortious, wrongful and in violation of public policy.

43.    As a result of Piper Jaffray's unlawful actions, Moran has suffered loss of past and future income, emotional distress, and other damages in an amount to be determined in arbitration. Further, Piper Jaffray's unlawful actions constitute oppressive, fraudulent, and/or malicious conduct, supporting an award of punitive damages.

## COUNT II

### Wrongful Discipline In Violation Of Public Policy

44.    Claimant incorporates the preceding paragraphs as if set forth herein in full.

45.    In retaliation for Moran's reports of violations of the Global Settlement Agreement, Piper Jaffray failed to compensate Moran in 2007 in a manner commensurate with his 2007 work performance. Piper Jaffray further failed to issue Moran his equity grant as scheduled. Piper Jaffray's failure to provide Moran with his proper, earned compensation was tortious, wrongful and in violation of public policy.

46.     As a result of Piper Jaffray's unlawful actions, Moran has suffered loss of past and future income, emotional distress, and other damages in an amount to be determined in arbitration.   Further, Piper Jaffray's unlawful actions constitute oppressive, fraudulent, and/or malicious conduct, supporting an award of punitive damages.

## COUNT III

### Breach of Contract

47.     Claimant incorporates the preceding paragraphs as if set forth herein in full.

48.     A contract, express and implied, written and oral, existed between Moran and Piper Jaffray.

49.     Under this contract, Moran was entitled to issuance of an equity grant of stock on February 15, 2008.

50.     Piper Jaffray has breached the contract by failing to issue the equity grant to Moran on February 15, 2008 and delaying the issuance to May 15, 2008.  As a result of the delay in issuance, these shares will vest three months later than they otherwise would have.

51.     As a result of Piper Jaffray's breach of contract, Moran has suffered economic damages in an amount to be determined in arbitration.

## Count IV

### Waiting Time Penalties

52.     Claimant incorporates the preceding paragraphs as if set forth herein in full.

53.     Moran was terminated from his employment with Piper Jaffray.   Piper Jaffray willfully failed to pay Moran all wages owed him within the time limits set forth in California Labor Code sections 201 and 202.

54.    Under Labor Code sections 201, 202, and 203, Moran is entitled to waiting time penalties for Piper Jaffray's willful failure to timely pay all wages owed upon separation of his employment.

## Count V

### Declaratory Relief

55.    Claimant incorporates the preceding paragraphs as if set forth herein in full.

56.    Cal. Bus. Prof. Code § 16600 declares that: "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

57.    Sections 2(d)(iii) and 2(d)(iv) of the 2007 and 2008 Agreements, and Sections 2(c)(ii), 2(c)(iii) and 2(c)(v) of the 2006 Agreement, violate Cal. Bus. Prof. Code § 16600 because they allow Defendant to forfeit Plaintiff's stocks if he accepts employment within his field and/or solicits Defendant's current or former clients, thereby placing an unlawful restraint on Plaintiff's ability to engage in a lawful profession.  Under Cal. Civ. Proc. Code § 1060, as incorporated by FINRA Code of Arbitration Procedure for Industry Disputes § 13804(b)(4), Plaintiff is entitled to a declaration that these agreements are void and unenforceable under California Law.

### PRAYER FOR RELIEF

WHEREFORE, Claimant Charles Jason Moran respectfully requests that the arbitration panel issue an award in his favor and against Respondent Piper Jaffray & Co., d/b/a Piper Jaffray as follows:

1.    For an award of damages, the exact amount to be determined by the arbitrators after the hearing;

11

2.    For pre-award and post-award interest on all damages awarded, with interest continuing to accrue until the date of the award is paid in full;

3.    For punitive damages;

4.    For a declaratory judgment that Sections 2(d)(iii) and 2(d)(iv) of the 2007 and 2008 Agreements and Sections 2(c)(ii), 2(c)(iii), and 2(c)(v) of the 2006 Agreement are void under Cal. Bus. Prof. Code § 16600; and

5.    For such other relief as the arbitrators deem just and equitable.

Dated: July 15, 2008

NICHOLS KASTER & ANDERSON, LLP

Matthew C. Helland (CA Bar No. 250451)
Helland@nka.com
One Embarcadero Center, Suite 720
San Francisco, CA 94109
Telephone: 415-277-7235
Facsimile: 415-277-7238

NICHOLS KASTER & ANDERSON, PLLP
James H. Kaster (CA Bar No. 248949)
Kaster@nka.com
4600 IDS Center, 80 South Eighth Street
Minneapolis, Minnesota 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878

ATTORNEYS FOR CLAIMANT MORAN

PIPER JAFFRAY COMPANIES
AMENDED AND RESTATED
2003 ANNUAL AND LONG-TERM INCENTIVE PLAN

RESTRICTED STOCK AGREEMENT
(Annual Grant)

| Name of Employee:   Charles J Moran | |
|---|---|
| No. of Shares Covered:   1,862 | Date of Issuance:   02/21/06 |

| Vesting Schedule pursuant to Section 2: | |
|---|---|
| Vesting Date(s)<br>02/21/09 | No. of Shares Which<br>Become Vested as of Such Date<br>1,862 |

This is a Restricted Stock Agreement ("Agreement") between Piper Jaffray Companies, a Delaware corporation (the "Company"), and the above-named employee of the Company (the "Employee").

Recitals

WHEREAS, the Company maintains the Piper Jaffray Companies Amended and Restated 2003 Annual and Long-Term Incentive Plan, as amended from time to time (the "Plan");

WHEREAS, the Board of Directors of the Company has appointed the Compensation Committee (the "Committee") with the authority to determine the awards to be granted under the Plan; and

WHEREAS, the Committee or its delegee has determined that the Employee is eligible to receive an award under the Plan in the form of restricted stock and has set the terms thereof;

NOW, THEREFORE, the Company hereby grants this award to the Employee under the terms set by the Committee as follows.



EXHIBIT
A

AM2003RSW

<u>Terms and Conditions</u><sup>*</sup>

1.   <u>Grant of Restricted Stock.</u>

(a)    Subject to the terms and conditions of this Agreement, the Company has granted to the Employee the number of Shares specified at the beginning of this Agreement. These Shares are subject to the restrictions provided for in this Agreement and are referred to collectively as the "Restricted Shares" and each as a "Restricted Share."

(b)    The Restricted Shares will be evidenced by a book entry made in the records of the Company's transfer agent in the name of the Employee (unless the Employee requests a certificate evidencing the Restricted Shares). All restrictions provided for in this Agreement will apply to each Restricted Share and to any other securities distributed with respect to that Restricted Share. Unless otherwise permitted by the Committee in accordance with the terms of the Plan, the Restricted Shares may not (until such Restricted Shares have vested in the Employee in accordance with all terms and conditions of this Agreement) be assigned or transferred other than by will or the laws of descent and distribution and shall not be subject to pledge, hypothecation, execution, attachment or similar process. Each Restricted Share will remain restricted and subject to forfeiture to the Company unless and until that Restricted Share has vested in the Employee in accordance with all of the terms and conditions of this Agreement. Each book entry (or stock certificate if requested by the Employee) evidencing any Restricted Share may contain such notations or legends and stock transfer instructions or limitations as may be determined or authorized by the Company in its sole discretion. If a certificate evidencing any Restricted Share is requested by the Employee, the Company may, in its sole discretion, retain custody of any such certificate throughout the period during which any restrictions are in effect and require, as a condition to issuing any such certificate, that the Employee tender to the Company a stock power duly executed in blank relating to such custody.

2.   <u>Vesting.</u>

(a)    If the Employee remains continuously employed (including during the continuance of any leave of absence approved by the Company or an Affiliate) by the Company or an Affiliate, then the Restricted Shares will vest in the numbers and on the dates specified in the Vesting Schedule at the beginning of this Agreement.

(b)    If the Employee's employment by the Company or an Affiliate terminates because of the Employee's death (or if the Employee dies within 90 days after termination of employment for any reason other than for Cause (as defined below)), then the unvested Restricted Shares will immediately vest in full.

(c)    If the Employee's employment with the Company or an Affiliate terminates for any reason, other than for Cause (as defined below) or because of the Employee's

---

<sup>*</sup>   Unless the context indicates otherwise, terms that are not defined in this Agreement shall have the meaning set forth in the Plan.

AM2003RSW

death, then the Restricted Shares shall continue to vest in accordance with the Vesting Schedule set forth above; provided, however, that any remaining Restricted Shares which do not become vested will immediately be forfeited in accordance with Section 4 of this Agreement if the Employee does any of the following after such termination:

     (i)    uses, discloses or misappropriates any Company-Related Information (as defined below) unless the Company or an Affiliate consents otherwise in writing. "Company-Related Information" means any confidential or secret knowledge or information of the Company or an Affiliate that the Employee has acquired or become acquainted with during the Employee's employment with the Company or an Affiliate, including, without limitation, any confidential customer list, confidential business information, confidential materials relating to the practices or procedures of the Company or an Affiliate, or any other proprietary information of the Company or an Affiliate; provided, however that Company-Related Information shall not include any knowledge or information that is now published or which subsequently becomes generally publicly known in the form in which it was obtained from the Company or an Affiliate, other than as a direct or indirect result of the Employee's disclosure in contradiction of this Section 2(c);

     (ii)    without the prior written consent of the Company or an Affiliate, directly or indirectly, owns, manages, operates, controls or participates in the ownership, management, operation or control of, or becomes connected as an officer, employee, partner, director, consultant, independent contractor or otherwise with, or has any financial interest or other pecuniary interest in, any Competing Business (as defined below). A "Competing Business" means any corporation, partnership, limited liability company or other business association, organization or entity or person of any kind whatsoever that (i) competes or plans to compete with the Company or any Affiliate in any line of business or (ii) otherwise offers any type of securities, investment or other financial products or services as a principal part of its business, regardless of whether such products or services are currently offered, or proposed to be offered, by the Company or any Affiliate. Notwithstanding the foregoing, ownership, for passive personal investment purposes only, of less than 5% of the voting stock of any publicly held corporation shall not by itself result in forfeiture of the Restricted Shares;

     (iii)    without the prior written consent of the Company or an Affiliate, accepts a position as an officer, employee, partner, consultant or independent contractor with any corporation, partnership, limited liability company or other business association, organization or entity or person of any kind whatsoever (regardless of whether such position is with a Competing Business) if such position involves duties, responsibilities or expertise similar to that of the Employee's position of employment with the Company or an Affiliate at the time of the Employee's termination of such employment;

     (iv)    directly or indirectly, on behalf of the Employee or any other person (including a Competing Business), solicits for employment in a Competing

AM2003RSW

Business any person who was employed by the Company or an Affiliate within three years prior to the date of the Employee's termination of employment; or

(v)    directly or indirectly, on behalf of the Employee or any other person (including a Competing Business), solicits any customers, clients or accounts of the Company or any Affiliate or otherwise seeks to divert such customers, clients or accounts away from the Company or any Affiliate.

(d)    Notwithstanding any other provisions of this Agreement to the contrary, the Committee may in its sole discretion, declare at any time that the Restricted Shares, or any portion thereof, shall vest immediately.

3.    <u>Lapse of Restrictions</u>.  Upon the vesting of any Restricted Shares, such vested Restricted Shares will no longer be subject to forfeiture as provided in Section 4 of this Agreement.

4.    <u>Forfeiture</u>.  If (i) the Employee attempts to pledge, encumber, assign, transfer or otherwise dispose of any of the Restricted Shares (except as permitted by Section 1(b) of this Agreement) or the Restricted Shares become subject to attachment or any similar involuntary process in violation of this Agreement, or (ii) the Employee's employment with the Company or an Affiliate (A) is terminated for Cause or (B) terminates under the circumstances covered by Section 2(c) of this Agreement and the Employee subsequently violates any of the restrictions contained in such Section, then any Restricted Shares that have not previously vested shall be forfeited by the Employee to the Company, the Employee shall thereafter have no right, title or interest whatever in such Restricted Shares, and, if the Company does not have custody of any and all certificates representing Restricted Shares so forfeited, the Employee shall immediately return to the Company any and all certificates representing Restricted Shares so forfeited. Additionally, the Employee will deliver to the Company a stock power duly executed in blank relating to any and all certificates representing Restricted Shares forfeited to the Company in accordance with the previous sentence or, if such stock power has previously been tendered to the Company, the Company will be authorized to deem such previously tendered stock power delivered, and the Company will be authorized to cancel any and all certificates representing Restricted Shares so forfeited and to cause a book entry to be made in the records of the Company's transfer agent in the name of the Employee (or a new stock certificate to be issued, if requested by the Employee) evidencing any Shares that vested prior to forfeiture. If the Restricted Shares are evidenced by a book entry made in the records of the Company's transfer agent, then the Company will be authorized to cause such book entry to be adjusted to reflect the number of Restricted Shares so forfeited. "Cause" means (i) the Employee's continued failure to substantially perform his or her duties with the Company or an Affiliate after demand for substantial performance is delivered to the Employee, (ii) the Employee's conviction of a crime (including misdemeanors) that, in the Company's determination, impairs the Employee's ability to perform his or her duties with the Company or an Affiliate, (iii) the Employee's violation of any policy of the Company or an Affiliate that the Company deems material, (iv) the Employee's violation of any securities law, rule or regulation that the Company deems material, (v) the Employee's engagement in conduct that, in the Company's determination, exposes the Company

4

AM2003RSW

or an Affiliate to civil or regulatory liability or injury to their reputations, (vi) the Employee's engagement in conduct that would subject the Employee to statutory disqualification pursuant to Section 15(b) of the Exchange Act and the regulations promulgated thereunder, or (vii) the Employee's gross or willful misconduct, as determined by the Company.

     5.    <u>Stockholder Rights</u>. As of the date of issuance specified at the beginning of this Agreement, the Employee shall have all of the rights of a stockholder of the Company with respect to the Restricted Shares, except as otherwise specifically provided in this Agreement.

     6.    <u>Tax Withholding</u>. The parties hereto recognize that the Company or an Affiliate may be obligated to withhold federal and state taxes or other taxes upon the vesting of the Restricted Shares, or, in the event that the Employee elects under Code Section 83(b) to report the receipt of the Restricted Shares as income in the year of receipt, upon the Employee's receipt of the Restricted Shares. The Employee agrees that, at such time, if the Company or an Affiliate is required to withhold such taxes, the Employee will promptly pay, in cash upon demand (or in any other manner permitted by the Committee in accordance with the terms of the Plan), to the Company or an Affiliate such amounts as shall be necessary to satisfy such obligation. The Employee further acknowledges that the Company has directed the Employee to seek independent advice regarding the applicable provisions of the Code, the income tax laws of any municipality, state or foreign country in which the Employee may reside, and the tax consequences of the Employee's death.

     7:    <u>Restrictive Legends and Stop-Transfer Orders</u>.

     (a)    <u>Legends</u>. The book entry or certificate representing the Restricted Shares shall contain a notation or bear the following legend (as well as any notations or legends required by applicable state and federal corporate and securities laws) noting the existence of the restrictions and the Company's rights to reacquire the Restricted Shares set forth in this Agreement:

        "THE SHARES REPRESENTED BY THIS [BOOK ENTRY] [CERTIFICATE] MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF A RESTRICTED STOCK AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY."

     (b)    <u>Stop-Transfer Notices</u>. The Employee agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

     (c)    <u>Refusal to Transfer</u>. The Company shall not be required (i) to transfer on its books any Restricted Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of the Restricted Shares or to

AM2003RSW

accord the right to vote or pay dividends to any purchaser or other transferee to whom the Restricted Shares shall have been so transferred.

8. <u>Interpretation of This Agreement</u>. All decisions and interpretations made by the Committee with regard to any question arising hereunder or under the Plan shall be binding and conclusive upon the Company and the Employee. If there is any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan shall govern.

9. <u>Not Part of Employment Contract; Discontinuance of Employment</u>. The Employee acknowledges that this Agreement awards restricted stock to the Employee, but does not impose any obligation on the Company to make any future grants or issue any future Awards to the Employee or otherwise continue the participation of the Employee under the Plan. This Agreement shall not give the Employee a right to continued employment with the Company or any Affiliate, and the Company or Affiliate employing the Employee may terminate his or her employment and otherwise deal with the Employee without regard to the effect it may have upon him or her under this Agreement.

10. <u>Binding Effect</u>. This Agreement shall be binding in all respects on the heirs, representatives, successors and assigns of the Employee.

11. <u>Choice of Law</u>. This Agreement is entered into under the laws of the State of Delaware and shall be construed and interpreted thereunder (without regard to its conflict-of-law principles).

12. <u>Entire Agreement</u>. This Agreement and the Plan set forth the entire agreement and understanding of the parties hereto with respect to the issuance and sale of the Restricted Shares and the administration of the Plan and supersede all prior agreements, arrangements, plans, and understandings relating to the issuance and sale of the Restricted Shares and the administration of the Plan.

13. <u>Amendment and Waiver</u>. Except as provided in the Plan, this Agreement may be amended, waived, modified, or canceled only by a written instrument executed by the parties or, in the case of a waiver, by the party waiving compliance.

14. <u>Acknowledgment of Receipt of Copy</u>. By execution hereof, the Employee acknowledges having received a copy of the prospectus related to the Plan and instructions on how to access a copy of the Plan.

AM2003RSW

2.  If I have used any of the following terms on this form and I have not otherwise specifically defined that term, the term shall have the following meaning: "issue" means all persons who are lineal descendants of the person whose issue are referred to, including legally adopted descendants and their descendants but not including illegitimate descendants and their descendants; "child" means an issue of the first generation; "per stirpes" means in equal shares among living children of the person whose issue are referred to and the issue (taken collectively) of each deceased child of such person, with such issue taking by right of representation of such deceased child; and "survive" means living after my death; provided, however, that if there is not sufficient evidence that a Beneficiary was living after my death, it shall be deemed that the Beneficiary was not living after my death. Unless I have otherwise specified in this designation, if a Beneficiary survives me but dies before receipt of all payments due him or her under the Plan, such remaining payments shall be payable to his or her estate and not to any other Beneficiary.

3.  If I designate as a Beneficiary the person who is my spouse on the date of this designation either by name or by relationship, or both, the dissolution, annulment or other legal termination of my marriage to such person shall revoke such designation, and this form shall be interpreted as if such person did not survive me. If I designate any other Beneficiary both by name and by relationship to me, the description of the relationship is for identification purposes only and the designation of the Beneficiary by name will be given effect without regard to whether the relationship exists now or at my death. Any designation of a Beneficiary only by statement of relationship to me shall be effective only to designate the person or persons having such relationship to me at my death.

4.  Any previous Beneficiary designation made by me is hereby revoked. I reserve the power to change this designation at any time by a form similar to this both signed by me and received by you prior to my death.

5.  This Beneficiary designation shall be effective only if it is both signed by me and received by you prior to my death.

| Participant's Signature | REDACTED 8368 | 03/08/06 |
| --- | --- | --- |
| | Social Security Number | Date |

2861 Clay St. San Francisco CA 94115

| Street | City | State | Zip |
| --- | --- | --- | --- |

Married (Check one)     ☐ Yes  ☐ No

IN WITNESS WHEREOF, the Employee and the Company have executed this Agreement as of the date of issuance specified at the beginning of this Agreement.

EMPLOYEE

Charles J. Moran

PIPER JAFFRAY COMPANIES

By      Andrew S. Duff
Its     Chairman and CEO

| Issuance Date | No. of Shares Covered | Vesting Date |
|---------------|----------------------|--------------|
| 02/21/06 | 1,862 | 02/21/09 |

AM2003RSW

## PIPER JAFFRAY COMPANIES
## AMENDED AND RESTATED
## 2003 ANNUAL AND LONG-TERM INCENTIVE PLAN

### RESTRICTED STOCK AGREEMENT

| Name of Employee: Charles J Moran | | |
|---|---|---|
| No. of Shares Covered: 2,913 | Date of Issuance: | February 15, 2007 |
| Vesting Schedule pursuant to Section 2: | | |

Vesting Date(s)
February 15, 2010

No. of Shares Which
Become Vested as of Such Date
2,913

This is a Restricted Stock Agreement ("Agreement") between Piper Jaffray Companies, a Delaware corporation (the "Company"), and the above-named employee of the Company (the "Employee").

### Recitals

WHEREAS, the Company maintains the Piper Jaffray Companies Amended and Restated 2003 Annual and Long-Term Incentive Plan, as amended from time to time (the "Plan");

WHEREAS, the Board of Directors of the Company has appointed the Compensation Committee (the "Committee") with the authority to determine the awards to be granted under the Plan; and

WHEREAS, the Committee or its delegee has determined that the Employee is eligible to receive an award under the Plan in the form of restricted stock and has set the terms thereof;

NOW, THEREFORE, the Company hereby grants this award to the Employee under the terms set by the Committee as follows.


EXHIBIT B

<u>Terms and Conditions</u>*

1.    <u>Grant of Restricted Stock.</u>

(a)    Subject to the terms and conditions of this Agreement, the Company has granted to the Employee the number of Shares specified at the beginning of this Agreement.  These Shares are subject to the restrictions provided for in this Agreement and are referred to collectively as the "Restricted Shares" and each as a "Restricted Share."

(b)    The Restricted Shares will be evidenced by a book entry made in the records of the Company's transfer agent in the name of the Employee (unless the Employee requests a certificate evidencing the Restricted Shares).  All restrictions provided for in this Agreement will apply to each Restricted Share and to any other securities distributed with respect to that Restricted Share. Unless otherwise permitted by the Committee in accordance with the terms of the Plan, the Restricted Shares may not (until such Restricted Shares have vested in the Employee in accordance with all terms and conditions of this Agreement) be assigned or transferred other than by will or the laws of descent and distribution and shall not be subject to pledge, hypothecation, execution, attachment or similar process.  Each Restricted Share will remain restricted and subject to forfeiture to the Company unless and until that Restricted Share has vested in the Employee in accordance with all of the terms and conditions of this Agreement.  Each book entry (or stock certificate if requested by the Employee) evidencing any Restricted Share may contain such notations or legends and stock transfer instructions or limitations as may be determined or authorized by the Company in its sole discretion.  If a certificate evidencing any Restricted Share is requested by the Employee, the Company may, in its sole discretion, retain custody of any such certificate throughout the period during which any restrictions are in effect and require, as a condition to issuing any such certificate, that the Employee tender to the Company a stock power duly executed in blank relating to such custody.

2.    <u>Vesting.</u>

(a)    If the Employee remains continuously employed (including during the continuance of any leave of absence as approved by the Company or an Affiliate) by the Company or an Affiliate, then the Restricted Shares will vest in the numbers and on the dates specified in the Vesting Schedule at the beginning of this Agreement.

(b)    If the Employee's employment by the Company or an Affiliate terminates because of the Employee's death or long-term disability (as defined in the Company's long-term disability plan, a "Disability"), then the unvested Restricted Shares will immediately vest in full.

(c)    If the Employee's employment by the Company or an Affiliate terminates as a result of a Severance Event (as defined in the Company's Severance Plan and as determined in the

---

*    Unless the context indicates otherwise, terms that are not defined in this Agreement shall have the meaning set forth in the Plan.

2                                              AM2003R507grant

sole discretion of the Company), then the unvested Restricted Shares will, as determined by the Committee and set forth in writing in a severance agreement, continue to vest in the numbers and on the dates specified in the Vesting Schedule at the beginning of this Agreement, so long as the Employee complies with the terms and conditions of the Severance Plan and the applicable severance agreement, including execution of a general release of all claims against the Company and any designated Affiliates and their respective agents, on a form provided by the Company for this purpose and within the timeframe designated by the Company, that becomes effective and enforceable.

(d)     If the Employee's employment with the Company or an Affiliate terminates for any reason other than for Cause (as defined below) or due to the Employee's death, Disability or as a result of a Severance Event (as set forth in paragraphs 2(b)-(c), above), then the Restricted Shares shall cease vesting and be forfeited in accordance with Section 4 of this Agreement, unless, at or around the time of such termination, the Employee voluntarily elects to sign a Post-Termination Agreement with the Company, and thereafter complies with the Employee's obligations under such agreement including the obligation to refrain from engaging in any Post-Termination Restricted Activities. "Post-Termination Restricted Activities" include each of the following:

(i)     at any time during the period set forth in the Post-Termination Agreement, the Employee uses, discloses or misappropriates any Company-Related Information (as defined below) unless the Company or an Affiliate consents otherwise in writing. "Company-Related Information" means any confidential or secret knowledge or information of the Company or an Affiliate that the Employee has acquired or become acquainted with during the Employee's employment with the Company or an Affiliate, including, without limitation, any confidential customer list, confidential business information, confidential materials relating to the practices or procedures of the Company or an Affiliate, or any other proprietary information of the Company or an Affiliate; provided, however that Company-Related Information shall not include any knowledge or information that is now published or which subsequently becomes generally publicly known in the form in which it was obtained from the Company or an Affiliate, other than as a direct or indirect result of the Employee's disclosure in contradiction of this Section 2(d);

(ii)     any time during the period set forth in the Post-Termination Agreement, the Employee directly or indirectly, on behalf of the Employee or any other person (including but not limited to a Talent Competitor (as defined below)), solicits for employment any person employed by the Company or an Affiliate who was employed by the Company or an Affiliate and with whom Employee interacted at any time within three (3) years prior to the date of the Employee's termination of employment;

(iii) any time during the period set forth in the Post-Termination Agreement, the Employee directly or indirectly, on behalf of any Talent Competitor, solicits any customer, client or account of the Company or any Affiliate, that was a customer, client or account of the Company or any Affiliate and with whom the Employee interacted at any time within three (3) years prior to the date of the Employee's termination of employment, or

the Employee otherwise seeks to divert any such customer, client or account away from the Company or any Affiliate; or

       (iv)    any time during the period set forth in the Post-Termination Agreement, without the prior written consent of the Company or an Affiliate, the Employee directly or indirectly owns, manages, operates, controls or participates in the ownership, management, operation or control of a Talent Competitor; or becomes connected as an officer, employee, partner, director, consultant, independent contractor or otherwise with a Talent Competitor; or has or acquires any financial or other pecuniary interest in any Talent Competitor. A "Talent Competitor" means any corporation, partnership, limited liability company or other business association, organization or entity or person of any kind whatsoever that engages in the investment banking, securities brokerage or investment management business, including, but not limited to, investment banks, sell-side broker dealers, mergers and acquisitions or strategic advisory firms, merchant banks, hedge funds, private equity firms, venture capital firms, asset managers and investment advisory firms. Notwithstanding the foregoing, however, ownership by the Employee, for passive personal investment purposes only, of less than 5% of the voting stock of a Talent Competitor that is any publicly held corporation shall not by itself constitute engaging in a Post-Termination Restricted Activity.

If and so long as the conditions of Paragraph 2(d) are satisfied, the Restricted Shares shall not cease to vest and be forfeited in accordance with Section 4 of this Agreement but, as set forth in the Post-Termination Agreement, shall vest in full or will continue to vest in the numbers and on the dates specified in the Vesting Schedule at the beginning of this Agreement.

       (e)    Notwithstanding any other provisions of this Agreement to the contrary, the Committee may in its sole discretion, declare at any time that the Restricted Shares, or any portion thereof, shall vest immediately or, to the extent they otherwise would be forfeited pursuant to the terms of this Agreement, shall vest in the numbers and on the dates specified in the Vesting Schedule at the beginning of this Agreement, or in such other numbers and on such other dates as are determined by the Committee to be in the interests of the Company as determined by the Committee in its sole discretion.

3.    <u>Lapse of Restrictions</u>. Upon the vesting of any Restricted Shares, such vested Restricted Shares will no longer be subject to forfeiture as provided in Section 4 of this Agreement.

4.    <u>Forfeiture</u>. If (i) the Employee attempts to pledge, encumber, assign, transfer or otherwise dispose of any of the Restricted Shares (except as permitted by Section 1(b) of this Agreement) or the Restricted Shares become subject to attachment or any similar involuntary process in violation of this Agreement, or (ii) the Employee's employment with the Company or an Affiliate (A) is terminated for Cause or (B) terminates under the circumstances covered by Section 2(c) or Section 2(d) of this Agreement and either (1) the conditions or restrictions of such Section, as applicable, are not satisfied or (2) the conditions or restrictions of such Section, as applicable, are satisfied but the Employee subsequently violates any of them, then any Restricted Shares that have not previously vested shall be forfeited by the Employee to the Company, the Employee shall

AM2003RS07grant

thereafter have no right, title or interest whatever in such Restricted Shares, and, if the Company does not have custody of any and all certificates representing Restricted Shares so forfeited, the Employee shall immediately return to the Company any and all certificates representing Restricted Shares so forfeited. Additionally, the Employee will deliver to the Company a stock power duly executed in blank relating to any and all certificates representing Restricted Shares forfeited to the Company in accordance with the previous sentence or, if such stock power has previously been tendered to the Company, the Company will be authorized to deem such previously tendered stock power delivered, and the Company will be authorized to cancel any and all certificates representing Restricted Shares so forfeited and to cause a book entry to be made in the records of the Company's transfer agent in the name of the Employee (or a new stock certificate to be issued, if requested by the Employee) evidencing any Shares that vested prior to forfeiture. If the Restricted Shares are evidenced by a book entry made in the records of the Company's transfer agent, then the Company will be authorized to cause such book entry to be adjusted to reflect the number of Restricted Shares so forfeited. "Cause" means (i) the Employee's continued failure to substantially perform his or her duties with the Company or an Affiliate after written demand for substantial performance is delivered to the Employee, (ii) the Employee's conviction of a crime (including misdemeanors) that, in the Company's determination, impairs the Employee's ability to perform his or her duties with the Company or an Affiliate, (iii) the Employee's violation of any policy of the Company or an Affiliate that the Company deems material, (iv) the Employee's violation of any securities law, rule or regulation that the Company deems material, (v) the Employee's engagement in conduct that, in the Company's determination, exposes the Company or an Affiliate to civil or regulatory liability or injury to their reputations, (vi) the Employee's engagement in conduct that would subject the Employee to statutory disqualification pursuant to Section 15(b) of the Exchange Act and the regulations promulgated thereunder, or (vii) the Employee's gross or willful misconduct, as determined by the Company.

5.     **Stockholder Rights.** As of the date of issuance specified at the beginning of this Agreement, the Employee shall have all of the rights of a stockholder of the Company with respect to the Restricted Shares, except as otherwise specifically provided in this Agreement.

6.     **Tax Withholding.** The parties hereto recognize that the Company or an Affiliate may be obligated to withhold federal and state taxes or other taxes upon the vesting of the Restricted Shares, or, in the event that the Employee elects under Code Section 83(b) to report the receipt of the Restricted Shares as income in the year of receipt, upon the Employee's receipt of the Restricted Shares. The Employee agrees that, at such time, if the Company or an Affiliate is required to withhold such taxes, the Employee will promptly pay, in cash upon demand (or in any other manner permitted by the Committee in accordance with the terms of the Plan), to the Company or an Affiliate such amounts as shall be necessary to satisfy such obligation. The Employee further acknowledges that the Company has directed the Employee to seek independent advice regarding the applicable provisions of the Code, the income tax laws of any municipality, state or foreign country in which the Employee may reside, and the tax consequences of the Employee's death.

AM2003RS07grant

7.  Restrictive Legends and Stop-Transfer Orders.

(a)  Legends.  The book entry or certificate representing the Restricted Shares shall contain a notation or bear the following legend (as well as any notations or legends required by applicable state and federal corporate and securities laws) noting the existence of the restrictions and the Company's rights to reacquire the Restricted Shares set forth in this Agreement:

"THE SHARES REPRESENTED BY THIS [BOOK ENTRY] [CERTIFICATE] MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF A RESTRICTED STOCK AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY."

(b)  Stop-Transfer Notices.  The Employee agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)  Refusal to Transfer.  The Company shall not be required (i) to transfer on its books any Restricted Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of the Restricted Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom the Restricted Shares shall have been so transferred.

8.  Interpretation of This Agreement.  All decisions and interpretations made by the Committee with regard to any question arising hereunder or under the Plan shall be binding and conclusive upon the Company and the Employee.  If there is any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan shall govern.

9.  Not Part of Employment Contract; Discontinuance of Employment.  The Employee acknowledges that this Agreement awards restricted stock to the Employee, but does not impose any obligation on the Company to make any future grants or issue any future Awards to the Employee or otherwise continue the participation of the Employee under the Plan.  This Agreement shall not give the Employee a right to continued employment with the Company or any Affiliate, and the Company or Affiliate employing the Employee may terminate his or her employment and otherwise deal with the Employee without regard to the effect it may have upon him or her under this Agreement.

10.  Binding Effect.  This Agreement shall be binding in all respects on the heirs, representatives, successors and assigns of the Employee.

11.  Choice of Law.  This Agreement is entered into under the laws of the State of Delaware and shall be construed and interpreted thereunder (without regard to its conflict-of-law principles).

AM2003RS07grant

11.    **Choice of Law**. This Agreement is entered into under the laws of the State of Delaware and shall be construed and interpreted thereunder (without regard to its conflict-of-law principles).

12.    **Entire Agreement**. This Agreement and the Plan set forth the entire agreement and understanding of the parties hereto with respect to the issuance and sale of the Restricted Shares and the administration of the Plan and supersede all prior agreements, arrangements, plans, and understandings relating to the issuance and sale of the Restricted Shares and the administration of the Plan.

13.    **Amendment and Waiver**. Except as provided in the Plan, this Agreement may be amended, waived, modified, or canceled only by a written instrument executed by the parties or, in the case of a waiver, by the party waiving compliance.

14.    **Acknowledgment of Receipt of Copy**. By execution hereof, the Employee acknowledges having received a copy of the prospectus related to the Plan and instructions on how to access a copy of the Plan.

IN WITNESS WHEREOF, the Employee and the Company have executed this Agreement as of the date of issuance specified at the beginning of this Agreement.

EMPLOYEE

Charles J Moran

PIPER JAFFRAY COMPANIES

By    Andrew S. Duff
Its    Chairman and CEO

| Issuance Date | No. of Shares Covered | Vesting Date |
|---|---|---|
| February 15, 2007 | 2,913 | February 15, 2010 |

7

### PIPER JAFFRAY COMPANIES
### AMENDED AND RESTATED
### 2003 ANNUAL AND LONG-TERM INCENTIVE PLAN

### RESTRICTED STOCK AGREEMENT

| Name of Employee: Charles J. Moran | |
|---|---|
| No. of Shares Covered: 6,362 | Date of Issuance:    May 15, 2008 |

Vesting Schedule pursuant to Section 2:

| Vesting Date(s) | No. of Shares Which Become Vested as of Such Date |
|---|---|
| May 15, 2011 | 6,362 |

This is a Restricted Stock Agreement ("Agreement") between Piper Jaffray Companies, a Delaware corporation (the "Company"), and the above-named employee of the Company (the "Employee").

### Recitals

WHEREAS, the Company maintains the Piper Jaffray Companies Amended and Restated 2003 Annual and Long-Term Incentive Plan, as amended from time to time (the "Plan");

WHEREAS, the Board of Directors of the Company has appointed the Compensation Committee (the "Committee") with the authority to determine the awards to be granted under the Plan; and

WHEREAS, the Committee or its delegee has determined that the Employee is eligible to receive an award under the Plan in the form of restricted stock and has set the terms thereof;

NOW, THEREFORE, the Company hereby grants this award to the Employee under the terms set by the Committee as follows.



**Terms and Conditions**

**1.**     **Grant of Restricted Stock.**

     (a)      Subject to the terms and conditions of this Agreement, the Company has granted to the Employee the number of Shares specified at the beginning of this Agreement. These Shares are subject to the restrictions provided for in this Agreement and are referred to collectively as the "Restricted Shares" and each as a "Restricted Share."

     (b)      The Restricted Shares will be evidenced by a book entry made in the records of the Company's transfer agent in the name of the Employee (unless the Employee requests a certificate evidencing the Restricted Shares). All restrictions provided for in this Agreement will apply to each Restricted Share and to any other securities distributed with respect to that Restricted Share. Unless otherwise permitted by the Committee in accordance with the terms of the Plan, the Restricted Shares may not (until such Restricted Shares have vested in the Employee in accordance with all terms and conditions of this Agreement) be assigned or transferred other than by will or the laws of descent and distribution and shall not be subject to pledge, hypothecation, execution, attachment or similar process. Each Restricted Share will remain restricted and subject to forfeiture to the Company unless and until that Restricted Share has vested in the Employee in accordance with all of the terms and conditions of this Agreement. Each book entry (or stock certificate if requested by the Employee) evidencing any Restricted Share may contain such notations or legends and stock transfer instructions or limitations as may be determined or authorized by the Company in its sole discretion. If a certificate evidencing any Restricted Share is requested by the Employee, the Company may, in its sole discretion, retain custody of any such certificate throughout the period during which any restrictions are in effect and require, as a condition to issuing any such certificate, that the Employee tender to the Company a stock power duly executed in blank relating to such custody.

**2.**     **Vesting.**

     (a)      If the Employee remains continuously employed (including during the continuance of any leave of absence as approved by the Company or an Affiliate) by the Company or an Affiliate, then the Restricted Shares will vest in the numbers and on the dates specified in the Vesting Schedule at the beginning of this Agreement.

     (b)      If the Employee's employment by the Company or an Affiliate terminates because of the Employee's death or long-term disability (as defined in the Company's long-term disability plan, a "Disability"), then the unvested Restricted Shares will immediately vest in full.

     (c)      If the Employee's employment by the Company or an Affiliate terminates as a result of a Severance Event (as defined in the Company's Severance Plan and as determined in the

---

    Unless the context indicates otherwise, terms that are not defined in this Agreement shall have the meaning set forth in the Plan.

2

sole discretion of the Company), then the unvested Restricted Shares will, as determined by the Committee and set forth in writing in a severance agreement, continue to vest in the numbers and on the dates specified in the Vesting Schedule at the beginning of this Agreement, so long as the Employee complies with the terms and conditions of the Severance Plan and the applicable severance agreement, including execution of a general release of all claims against the Company and any designated Affiliates and their respective agents, on a form provided by the Company for this purpose and within the timeframe designated by the Company, that becomes effective and enforceable.

(d)    If the Employee's employment with the Company or an Affiliate terminates for any reason other than for Cause (as defined below) or due to the Employee's death, Disability or as a result of a Severance Event (as set forth in paragraphs 2(b)-(c), above), then the Restricted Shares shall cease vesting and be forfeited in accordance with Section 4 of this Agreement, unless, at or around the time of such termination, the Employee voluntarily elects to sign a Post-Termination Agreement with the Company, and thereafter complies with the Employee's obligations under such agreement including the obligation to refrain from engaging in any Post-Termination Restricted Activities. "Post-Termination Restricted Activities" include each of the following:

(i)    at any time during the period set forth in the Post-Termination Agreement, the Employee uses, discloses or misappropriates any Company-Related Information (as defined below) unless the Company or an Affiliate consents otherwise in writing. "Company-Related Information" means any confidential or secret knowledge or information of the Company or an Affiliate that the Employee has acquired or become acquainted with during the Employee's employment with the Company or an Affiliate, including, without limitation, any confidential customer list, confidential business information, confidential materials relating to the practices or procedures of the Company or an Affiliate, or any other proprietary information of the Company or an Affiliate; provided, however that Company-Related Information shall not include any knowledge or information that is now published or which subsequently becomes generally publicly known in the form in which it was obtained from the Company or an Affiliate, other than as a direct or indirect result of the Employee's disclosure in contradiction of this Section 2(d);

(ii)    any time during the period set forth in the Post-Termination Agreement, the Employee directly or indirectly, on behalf of the Employee or any other person (including but not limited to a Talent Competitor (as defined below)), solicits for employment any person employed by the Company or an Affiliate who was employed by the Company or an Affiliate and with whom Employee interacted at any time within three (3) years prior to the date of the Employee's termination of employment;

(iii)any time during the period set forth in the Post-Termination Agreement, the Employee directly or indirectly, on behalf of any Talent Competitor, solicits any customer, client or account of the Company or any Affiliate, that was a customer, client or account of the Company or any Affiliate and with whom the Employee interacted at

AM2003RS08grant

any time within three (3) years prior to the date of the Employee's termination of employment, or the Employee otherwise seeks to divert any such customer, client or account away from the Company or any Affiliate; or

(iv)    any time during the period set forth in the Post-Termination Agreement, without the prior written consent of the Company or an Affiliate, the Employee directly or indirectly owns, manages, operates, controls or participates in the ownership, management, operation or control of a Talent Competitor; or becomes connected as an officer, employee, partner, director, consultant, independent contractor or otherwise with a Talent Competitor; or has or acquires any financial or other pecuniary interest in any Talent Competitor. A "Talent Competitor" means any corporation, partnership, limited liability company or other business association, organization or entity or person of any kind whatsoever that engages in the investment banking, securities brokerage or investment management business, including, but not limited to, investment banks, sell-side broker dealers, mergers and acquisitions or strategic advisory firms, merchant banks, hedge funds, private equity firms, venture capital firms, asset managers and investment advisory firms. Notwithstanding the foregoing, however, ownership by the Employee, for passive personal investment purposes only, of less than 5% of the voting stock of a Talent Competitor that is any publicly held corporation shall not by itself constitute engaging in a Post-Termination Restricted Activity.

If and so long as the conditions of Paragraph 2(d) are satisfied, the Restricted Shares shall not cease to vest and be forfeited in accordance with Section 4 of this Agreement but, as set forth in the Post-Termination Agreement, shall vest in full or will continue to vest in the numbers and on the dates specified in the Vesting Schedule at the beginning of this Agreement.

(e)    Notwithstanding any other provisions of this Agreement to the contrary, the Committee may in its sole discretion, declare at any time that the Restricted Shares, or any portion thereof, shall vest immediately or, to the extent they otherwise would be forfeited pursuant to the terms of this Agreement, shall vest in the numbers and on the dates specified in the Vesting Schedule at the beginning of this Agreement, or in such other numbers and on such other dates as are determined by the Committee to be in the interests of the Company as determined by the Committee in its sole discretion.

3.    <u>Lapse of Restrictions</u>. Upon the vesting of any Restricted Shares, such vested Restricted Shares will no longer be subject to forfeiture as provided in Section 4 of this Agreement.

4.    <u>Forfeiture</u>. If (i) the Employee attempts to pledge, encumber, assign, transfer or otherwise dispose of any of the Restricted Shares (except as permitted by Section 1(b) of this Agreement) or the Restricted Shares become subject to attachment or any similar involuntary process in violation of this Agreement, or (ii) the Employee's employment with the Company or an Affiliate (A) is terminated for Cause or (B) terminates under the circumstances covered by Section 2(c) or Section 2(d) of this Agreement and either (1) the conditions or restrictions of such Section, as applicable, are not satisfied or (2) the conditions or restrictions of such Section, as applicable, are satisfied but the Employee subsequently violates any of them, then any Restricted

4                    AM2003RS08grant

Shares that have not previously vested shall be forfeited by the Employee to the Company, the Employee shall thereafter have no right, title or interest whatever in such Restricted Shares, and, if the Company does not have custody of any and all certificates representing Restricted Shares so forfeited, the Employee shall immediately return to the Company any and all certificates representing Restricted Shares so forfeited. Additionally, the Employee will deliver to the Company a stock power duly executed in blank relating to any and all certificates representing Restricted Shares forfeited to the Company in accordance with the previous sentence or, if such stock power has previously been tendered to the Company, the Company will be authorized to deem such previously tendered stock power delivered, and the Company will be authorized to cancel any and all certificates representing Restricted Shares so forfeited and to cause a book entry to be made in the records of the Company's transfer agent in the name of the Employee (or a new stock certificate to be issued, if requested by the Employee) evidencing any Shares that vested prior to forfeiture. If the Restricted Shares are evidenced by a book entry made in the records of the Company's transfer agent, then the Company will be authorized to cause such book entry to be adjusted to reflect the number of Restricted Shares so forfeited. "Cause" means (i) the Employee's continued failure to substantially perform his or her duties with the Company or an Affiliate after written demand for substantial performance is delivered to the Employee, (ii) the Employee's conviction of a crime (including misdemeanors) that, in the Company's determination, impairs the Employee's ability to perform his or her duties with the Company or an Affiliate, (iii) the Employee's violation of any policy of the Company or an Affiliate that the Company deems material, (iv) the Employee's violation of any securities law, rule or regulation that the Company deems material, (v) the Employee's engagement in conduct that, in the Company's determination, exposes the Company or an Affiliate to civil or regulatory liability or injury to their reputations, (vi) the Employee's engagement in conduct that would subject the Employee to statutory disqualification pursuant to Section 15(b) of the Exchange Act and the regulations promulgated thereunder, or (vii) the Employee's gross or willful misconduct, as determined by the Company.

5.    <u>Stockholder Rights</u>. As of the date of issuance specified at the beginning of this Agreement, the Employee shall have all of the rights of a stockholder of the Company with respect to the Restricted Shares, except as otherwise specifically provided in this Agreement.

6.    <u>Tax Withholding</u>. The parties hereto recognize that the Company or an Affiliate may be obligated to withhold federal and state taxes or other taxes upon the vesting of the Restricted Shares, or, in the event that the Employee elects under Code Section 83(b) to report the receipt of the Restricted Shares as income in the year of receipt, upon the Employee's receipt of the Restricted Shares. The Employee agrees that, at such time, if the Company or an Affiliate is required to withhold such taxes, the Employee will promptly pay, in cash upon demand (or in any other manner permitted by the Committee in accordance with the terms of the Plan), to the Company or an Affiliate such amounts as shall be necessary to satisfy such obligation. The Employee further acknowledges that the Company has directed the Employee to seek independent advice regarding the applicable provisions of the Code, the income tax laws of any municipality, state or foreign country in which the Employee may reside, and the tax consequences of the Employee's death.

AM2003RS08grant

7.    <u>Restrictive Legends and Stop-Transfer Orders</u>.

    (a)    <u>Legends</u>.  The book entry or certificate representing the Restricted Shares shall contain a notation or bear the following legend (as well as any notations or legends required by applicable state and federal corporate and securities laws) noting the existence of the restrictions and the Company's rights to reacquire the Restricted Shares set forth in this Agreement:

> "THE SHARES REPRESENTED BY THIS [BOOK ENTRY] [CERTIFICATE] MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF A RESTRICTED STOCK AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY."

    (b)    <u>Stop-Transfer Notices</u>.  The Employee agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

    (c)    <u>Refusal to Transfer</u>.  The Company shall not be required (i) to transfer on its books any Restricted Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of the Restricted Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom the Restricted Shares shall have been so transferred.

8.    <u>Interpretation of This Agreement</u>.  All decisions and interpretations made by the Committee with regard to any question arising hereunder or under the Plan shall be binding and conclusive upon the Company and the Employee.  If there is any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan shall govern.

9.    <u>Not Part of Employment Contract; Discontinuance of Employment</u>.  The Employee acknowledges that this Agreement awards restricted stock to the Employee, but does not impose any obligation on the Company to make any future grants or issue any future Awards to the Employee or otherwise continue the participation of the Employee under the Plan.  This Agreement shall not give the Employee a right to continued employment with the Company or any Affiliate, and the Company or Affiliate employing the Employee may terminate his or her employment and otherwise deal with the Employee without regard to the effect it may have upon him or her under this Agreement.

10.    <u>Binding Effect</u>.  This Agreement shall be binding in all respects on the heirs, representatives, successors and assigns of the Employee.

6

AM20030R508grant

11.     <u>Choice of Law</u>.  This Agreement is entered into under the laws of the State of Delaware and shall be construed and interpreted thereunder (without regard to its conflict-of-law principles).

12.     <u>Entire Agreement</u>.  This Agreement and the Plan set forth the entire agreement and understanding of the parties hereto with respect to the issuance and sale of the Restricted Shares and the administration of the Plan and supersede all prior agreements, arrangements, plans, and understandings relating to the issuance and sale of the Restricted Shares and the administration of the Plan.

13.     <u>Amendment and Waiver</u>.  Except as provided in the Plan, this Agreement may be amended, waived, modified, or canceled only by a written instrument executed by the parties or, in the case of a waiver, by the party waiving compliance.

14.     <u>Acknowledgment of Receipt of Copy</u>.  By execution hereof, the Employee acknowledges having received a copy of the prospectus related to the Plan and instructions on how to access a copy of the Plan.

IN WITNESS WHEREOF, the Employee and the Company have executed this Agreement as of the date of issuance specified at the beginning of this Agreement.

EMPLOYEE

Charles J. Moran

PIPER JAFFRAY COMPANIES

By      Andrew S. Duff
Its     Chairman and CEO

| Issuance Date | No. of Shares Covered | Vesting Date |
|---------------|----------------------|--------------|
| May 15, 2008  | 6,362                | May 15, 2011 |

7

AM2003RS08grant

# PiperJaffray.

800 Nicollet Mall, Minneapolis, MN 55402-7020
Tel: 612 303-6000  |  Tel: 800 333-6000  |  Fax 612 303-1410
Piper Jaffray & Co. Since 1895. Member SIPC and NYSE.

June 13, 2006

Charles J. Moran
2861 Clay Street
San Francisco, CA 94115

Dear Jason,

On behalf of Piper Jaffray, I am very pleased to confirm our understanding of continued employment.

At Piper Jaffray, our people make the difference for our clients. We are proud of our 110-year legacy and unique culture, which continue to attract and retain the best and the brightest such as you. We look forward to your contributions as you continue your journey with us here at Piper Jaffray.

Please allow me to detail some of the terms and conditions of our offer to you. I welcome and invite your questions at any time.

<u>Department</u>
You will continue to be a significant contributor to our Health Care Investment Banking effort with a primary focus in the biopharmaceutical sector.

<u>Base Salary</u>
You will continue at your annualized base salary of $140,000.00

<u>Work Location/Travel</u>
You will continue to work out of the San Francisco office of Piper Jaffray.

<u>Officer Title</u>
You will continue in your role as a Principal. In the Spring of 2008, we have the expectation that you will be promoted to Managing Director. However, any promotion is contingent upon your satisfactory fulfillment of our customary Investment Banking promotion criteria and approval by the Piper Jaffray Management Committee.

1



**2006 Guaranteed Total Compensation**

From January 1, 2006 through December 31, 2006, you are guaranteed a minimum total compensation of $800,000, less applicable taxes and other required or authorized withholdings ("2006 Guaranteed Total Compensation"), so long as you are an employee in good standing throughout calendar year 2006 and through the date(s) on which 2006 bonuses are paid and/or equity awards are granted, or in the event that Piper Jaffray terminates your employment other than for "Cause," as defined below, and you sign a release of claims acceptable to Piper Jaffray.  For the avoidance of doubt, if you are terminated for "Cause" or if you voluntarily resign from your employment, you are not eligible to receive the 2006 Guaranteed Total Compensation.  Any determinations by the Company with respect to "Cause" will be reasonable. Your 2006 Guaranteed Total Compensation will consist of the following:

- An annualized base salary of $140,000, prorated and payable to you on Piper Jaffray's regular paydays.
- The remainder of your 2006 Guaranteed Total Compensation, or the difference between your actual salary payments and the guarantee amount listed above, may be paid in a combination of a cash bonus and an equity grant.  The equity grant may take the form of restricted stock, stock options, or other stock-based compensation.  Any equity grant will be consistent, as to amounts, terms and type of grant, with comparably compensated employees in Corporate and Institutional Services.  All equity grants are subject to approval by the CEO and/or the Compensation Committee of the Board of Directors of Piper Jaffray Companies and will be subject to the terms and conditions of the applicable plan.  Both the cash bonus and any equity grant will be payable and/or made at such time that Piper Jaffray pays its bonus compensation and makes its equity grants with respect to 2006 performance.  Historically we have paid cash bonus awards by February 28th and made equity grants by March 31st of the subsequent year.

**2007 Guaranteed Total Compensation**

From January 1, 2007 through December 31, 2007, you are guaranteed a minimum total compensation of $800,000, less applicable taxes and other required or authorized withholdings ("2007 Guaranteed Total Compensation"), so long as you are an employee in good standing throughout calendar year 2007 and through the date(s) on which 2007 bonuses are paid and/or equity awards are granted, or in the event that Piper Jaffray terminates your employment other than for "Cause," as defined below, and you sign a release of claims acceptable to Piper Jaffray.  For the avoidance of doubt, if you are terminated for "Cause" or if you voluntarily resign from your employment, you are not eligible to receive the 2007 Guaranteed Total Compensation.  Any determinations by the Company with respect to "Cause" will be reasonable. Your 2007 Guaranteed Total Compensation will consist of the following:

- An annualized base salary of $140,000, prorated and payable to you on Piper Jaffray's regular paydays.
- The remainder of your 2007 Guaranteed Total Compensation, or the difference between your actual salary payments and the guarantee amount listed above, may be paid in a combination of a cash bonus and an equity grant.  The equity grant may take the form of restricted stock, stock options, or other stock-based compensation.  Any equity grant will be consistent, as to amounts, terms and type of grant, with comparably compensated employees in Corporate and Institutional Services.  All equity grants are subject to approval by the CEO and/or the Compensation Committee of the Board of Directors of Piper Jaffray Companies and will be subject to the terms and conditions of the applicable plan.  Both the cash bonus and any equity grant will be payable and/or made at such time that Piper Jaffray pays its bonus compensation and makes its equity grants with respect to 2007 performance.  Historically we have paid cash bonus awards by February 28th and made equity grants by March 31st of the subsequent year.

## Cause

"Cause" for purposes of this letter means (i) your continued failure to substantially perform your duties with the Company or an Affiliate after demand for substantial performance is delivered to the you, (ii) your conviction of a crime (including misdemeanors) that, in the Company's determination, impairs your ability to perform your duties with the Company or an Affiliate, (iii) your violation of any firm policy that the Company deems material, (iv) your violation of any securities law, rule or regulation that the Company deems material, (v) your engagement in conduct that, in the Company's determination, exposes the firm to civil or regulatory liability or injury to its reputation, (vi) your engagement in conduct that would subject you to Statutory Disqualification pursuant to Section 15(b) of the Securities Exchange Act of 1934 and the regulations promulgated thereunder, or (vii) your gross or willful misconduct, as determined by the Company.

## Non-Solicitation Agreement

You will be subject to a non-solicitation provision as follows. From the date you execute this letter through February 28, 2008, you agree that you will not directly or indirectly, solicit or assist in the solicitation of: (1) any of Piper Jaffray's current clients/customers, (2) companies with which, at the time of your departure, Piper Jaffray is in active discussions about becoming clients/customers of Piper Jaffray; or (3) Piper Jaffray employees. You acknowledge and agree that the guaranteed compensation that Piper Jaffray has offered to you in this letter is sufficient consideration for your non-solicitation provision contained herein.

## Individual Severance Arrangement

If you become entitled to the 2006 or 2007 Guaranteed Total Compensation outlined above at the termination of your employment, then you will not be entitled to receive payment under any other severance pay plan or program sponsored by Piper Jaffray or any of its affiliates.

## At Will Employment

Your employment continues to be at will. Nothing in this letter modifies the at-will employment relationship between you and Piper Jaffray. You and Piper Jaffray retain the right to terminate your employment, without notice at any time, for any reason.

## Remedies and Governing Law

You agree that any controversy or dispute arising between us in respect of this Agreement may be submitted for arbitration before the NASD at the request of either of us.

You agree that California law, including its provisions with respect to conflict of laws, shall govern all questions concerning the interpretation, validity, enforceability and assignment of this Agreement. If any part of this Agreement is found to be void, unenforceable or invalid, for any reason whatsoever, the remainder of this Agreement shall remain in full force and effect.

## Letter Confidentiality

You agree to keep the existence and terms of this letter strictly confidential, except that you may disclose them to your attorney, accountants and tax advisors, and immediate family members provided they agree to hold them strictly confidential.

3

**<u>Entire Agreement Between the Parties</u>**
This letter incorporates the entire agreement and understanding between you and Piper Jaffray relating
to your 2006 and 2007 Guaranteed Total Compensation. This letter replaces any prior agreements or
understandings between you and Piper Jaffray relating to your 2006 and 2007 Guaranteed Total
Compensation and any and all such prior agreements or understandings are superseded by this letter.

Sincerely,

Jon W. Salveson, Managing Director
Head of Investment Banking


I have read and accept this offer as it relates to my continued employment:


_____
Charles J. Moran



Date: _____


cc:  Gary Maki
     Deb Schoneman

# PiperJaffray.    Memo

**Confidential**

| | |
|---|---|
| To: | Jason Moran |
| From: | Bob DeSutter<br>Co-Group Head, Healthcare Investment Banking<br>Stuart Duty<br>Co-Group Head, Healthcare Investment Banking |
| Date: | February 11, 2008 |
| Re: | Termination and Transition |

This memo confirms our discussion today regarding the end of your employment with Piper Jaffray & Co.

As discussed, Piper Jaffray will honor the terms of your 2007 guaranteed bonus made to you in your retention agreement. This guaranteed bonus of $800,000 will be paid in accordance with the terms set forth in that agreement.

Your U5 will be coded as "Discharged" with the following explanation provided: "No sales, policy or business practice violation at issue. Piper Jaffray determined that the employee's performance did not meet its expectations of an Investment Banking Managing Director in all respects."

If you find other employment or wish to end your employment with Piper Jaffray prior to April 15, 2008 you may do so and your U5 will be coded as "Permitted to Resign."

In order to provide for a smooth transition out of the firm and finding new employment, Piper Jaffray will maintain the confidentiality of this conversation within the firm and allow you to remain on payroll through April 15, 2008 on the conditions that:

- You conduct yourself professionally with internal employees and clients of the firm.
- Professionally transition work.
- You do not discuss this matter with any employees of Piper Jaffray.
- You do not disparage the firm, any employee of the firm, or clients of the firm.
- Concerns are addressed to me, Anne Johnson (HR) or Christine Esckilsen (Legal).

If you violate any of these conditions prior to April 15, 2008, your employment will be terminated immediately.

_____        _____
Jason Moran                                                    Date

_____        _____
Stuart Duty                                                       Date



CLAIM INFORMATION SHEET

**I.     PARTIES**

CLAIMANT(S): (Provide this information even if you are represented by counsel.)

Charles Jason Moran

Name

2861 Clay Street

Address

San Francisco                    CA                    94115

City                                State                    Zip Code

415-297-4407

Daytime Telephone                 Fax #                    Email Address

Residence during the time of the dispute (if different from above):

Name

Address

City                                State                    Zip Code

Claimant is a:
☐ Public customer     ☐ Broker-dealer     ☒ Person associated with a broker-dealer
                      BD #                 CRD # 3242073

**Claimant's Counsel/Representative (if applicable): (Note: FINRA requires that persons representing Florida investors in arbitration proceedings conducted in or outside of the State of Florida affirm either that they are licensed to practice law and provide a bar identification number, or that they are not receiving compensation in connection with representing the party in the arbitration proceeding.)**

Matthew Helland                   #250451

Name                                Bar ID # (if applicable)

One Embarcadero Center, Suite 720

Address

San Francisco,                    CA                    94111

City                                State                    Zip Code

415-277-7239                      415-277-7238      helland@nka.com

Business Telephone                Fax #                    Email Address

**If needed, copy this page to list additional accounts.**

13

CLAIM INFORMATION SHEET

## RESPONDENT(S)

**Respondent #1:**

Piper Jaffray & Co., d/b/a Piper Jaffray

Name

800 Nicollet Mall

Address

| Minneapolis | MN | 55402 |
|---|---|---|
| City | State | Zip Code |

612-303-6000

| Business Telephone | Fax | Email Address |
|---|---|---|

Respondent #1 is a:

☐ Public customer     ☒ Broker-dealer     ☐ Person associated with a broker-dealer

BD #   665            CRD #

**Respondent #2:**

Name

Address

| City | State | Zip Code |
|---|---|---|

| Business Telephone | Fax # | Email Address |
|---|---|---|

Respondent #2 is a :

☐ Public customer     ☐ Broker-dealer     ☐ Person associated with a broker-dealer

BD #                  CRD #

**If needed, copy this page to list additional accounts.**

14

CLAIM INFORMATION SHEET

## II.  CLAIMS

**Accounts:** If the dispute or claim involves activity with respect to an account or accounts, please list each account and indicate the type of account it is (*e.g.*, joint account, custodial account, etc.)

**1.**

| | |
|---|---|
| Name (exactly as it appears on the account) | Type of Account |
| Name of Firm and Branch Office | Date Account Opened |
| Name of Registered Representative | Account Number |

**2.**

| | |
|---|---|
| Name (exactly as it appears on the account) | Type of Account |
| Name of Firm and Branch Office | Date Account Opened |
| Name of Registered Representative | Account Number |

**3.**

| | |
|---|---|
| Name (exactly as it appears on the account) | Type of Account |
| Name of Firm and Branch Office | Date Account Opened |
| Name of Registered Representative | Account Number |

**If needed, copy this page to list additional accounts.**

CLAIM INFORMATION SHEET                                    Type of Dispute: (Check where applicable)

**a.** **Account Related**

|   | Breach of Contract |   | Collection |   | Dividends |
|---|---|---|---|---|---|
|   | Errors/Charges |   | Exchanges |   | Failure to Supervise |
|   | Margin Calls |   | Negligence |   | Transfer |
|   | Other |   |   |   |   |

**b.** **Executions**

|   | Execution Price |   | Failure to Execute |   | Incorrect Quantity |
|---|---|---|---|---|---|
|   | Limit Versus Market Order |   | Other |   |   |

**c.** **Account Activity**

|   | Breach of Fiduciary Duty |   | Churning |   | Manipulations |
|---|---|---|---|---|---|
|   | Misrepresentations/Non-Disclosures |   | Omission of Facts |   | Suitability |
|   | Unauthorized Trading |   | Other |   |   |

**d.** **Employment**

|   | Breach of Contract |   | Commissions | X | Compensation |
|---|---|---|---|---|---|
| X |   |   |   |   |   |
|   | Discrimination Age |   | Discrimination Disability |   | Discrimination Gender |
|   | Discrimination National Origin |   | Discrimination Race |   | Discrimination Religion |
|   | Discrimination Sexual Preference |   | Partnerships |   | Promissory Notes |
|   | Sexual Harassment |   | Training Contracts | X | Wrongful Termination |
|   | Other |   | Libel or Slander on Form U-5 |   | Libel or Slander |

**e.** **Trading Dispute**

|   | Buy-In |   | D.K.s |   | Manipulation |
|---|---|---|---|---|---|
|   | Markups |   | Sell Outs |   | Stock Loan |
|   | Transfers |   | Others |   |   |

**f.** **Other**

|   | Clearing Dispute |   | Defamation |   | Indemnification |
|---|---|---|---|---|---|
|   | Raiding Disputes |   | Underwriting |   | Other |

**Type of Security(ies), Financial Instrument(s), and/or Investment(s) Involved in the Dispute:**

|   | Annuities |   | Certificates of Deposit |   | Commodities Futures |
|---|---|---|---|---|---|
|   | Common Stock |   | Corporate Bonds |   | "Fannie Maes" |
|   | "Freddie Macs" |   | "Ginnie Maes" |   | Government Securities |
|   | Hedge Funds |   | Limited Partnerships |   | Mutual Funds |
|   | Municipal Bonds |   | Municipal Bond Funds |   | Options |
|   | Other Types of Securities |   | Preferred Stock |   | Repurchase Agreements |
|   | Real Estate Investment Trust |   | Reverse Repurchase Agreements |   | Stock Index Futures |
|   | Warrants/Rights |   |   |   |   |

16

CLAIM INFORMATION SHEET

**III.    RELIEF REQUESTED**

**1.    Damages**

Actual Damages Requested                                $ _____  1.
(monetary sum required to compensate a party for
his or her loss excluding interests and expenses)

Punitive Damages Requested                                _____  2.
(monetary amount intended to punish the wrongdoer)

                                    * AMOUNT IN DISPUTE:    _____  3.

                                    * Use this amount to calculate the correct filing fee
                                      and hearing session deposit in Part IV. This amount
                                      *must* match the amount stated in your claim.

Interest                                              _____
(include calculations, if possible)

**2.    Other Type of Relief Requested**

Specific Performance (Specify the type of specific performance sought)
(specific performance requires parties to take an action, such as turning over ownership of stocks)

_____

Injunctive Relief (Specify the type of injunctive relief sought)
(injunctions require parties to refrain from certain actions)
          Claimant seeks an order enjoing Respondent from enforcing
          certain provisions of the parties Restricted Stock Agreements.

**3.    Costs**
(Provide specific amounts, if known. If not known, please mark an "X" to indicate the costs you are requesting)

          X
_____
Forum Fees
          X
_____
Attorney's Fees
          X
_____
Witness and Production Fees
          X
_____
Other Case-Related Costs

CLAIM INFORMATION SHEET

Customer or Associated Person Claimant

## IV. FEES

**TO DETERMINE THE CORRECT FEE, USE THE "AMOUNT IN DISPUTE" FIGURE ON LINE 3, PAGE 17.**

If you are a *CUSTOMER OR ASSOCIATED PERSON CLAIMANT* use this table (NASD Rule 12900 of the *Customer Code* or Rule 13900 of the *Industry Code*) to determine the filing fee that **MUST** accompany a Statement of Claim when it is filed with FINRA. If your claim does **NOT** disclose or specify a monetary claim, the filing fee is $1,250.

Find the amount of your dispute on the chart, then find the applicable claim filing fee.

**Filing Fees for Claims Filed by Customers, Associated Persons, and Other Non-Members**

| Amount of Claim (exclusive of interest and expenses) | Filing Fee |
|---|---|
| $.01 to $1,000 | $50 |
| $1,000.01 to $2,500 | $75 |
| $2,500.01 to $5,000 | $175 |
| $5,000.01 to $10,000 | $325 |
| $10,000.01 to $25,000 | $425 |
| $25,000.01 to $50,000 | $600 |
| $50,000.01 to $100,000 | $975 |
| $100,000.01 to $500,000 | $1,425 |
| $500,000.01 to $1 million | $1,575 |
| Over $1 million | $1,800 |
| Non-Monetary/Not Specified | $1,250 |

Once you have determined the correct filing fee, submit it with your Statement of Claim. For example, if you are a **customer** or **associated person** claimant and the amount of your claim is $40,000, the claim filing fee is $600. Mail the check with your Statement of Claim, Claim Information Sheet, and properly executed Submission Agreement.

CLAIM INFORMATION SHEET

## Member Claimant

**TO DETERMINE THE CORRECT FEE, USE THE "AMOUNT IN DISPUTE" FIGURE ON LINE 3, PAGE 17.**

If you are a *MEMBER CLAIMANT* use this table (NASD Rule 12900 of the *Customer Code* or Rule 13900 of the *Industry Code*) to determine the filing fee that **MUST** accompany a Statement of Claim when it is filed with FINRA. If your claim does **NOT** disclose or specify a monetary claim, the filing fee is $1,500.

Find the amount of your dispute on the chart, then find the applicable claim filing fee.

### Member Claimant

| Amount of Claim (exclusive of interest and expenses) | Filing Fee |
| --- | --- |
| $.01 to $1,000 | $225 |
| $1,000.01 to $2,500 | $350 |
| $2,500.01 to $5,000 | $525 |
| $5,000.01 to $10,000 | $750 |
| $10,000.01 to $25,000 | $1,050 |
| $25,000.01 to $50,000 | $1,450 |
| $50,000.01 to $100,000 | $1,750 |
| $100,000.01 to $500,000 | $2,125 |
| $500,000.01 to $1,000,000 | $2,450 |
| $1,000,000.01 to $5,000,000 | $3,200 |
| Over $5,000,000 | $3,700 |
| Non-Monetary/Not Specified | $1,500 |

Once you have determined the correct filing fee, you should calculate the appropriate member surcharge outlined on page 20 and submit the total with your Statement of Claim. For example, if you are a **member** claimant and the amount of your claim is $40,000, the claim filing fee is $1,450, and the member surcharge is $875. Therefore, you should send one check **payable to FINRA Dispute Resolution** in the amount of $2,325. Mail the check with your Statement of Claim, Claim Information Sheet, and properly executed Submission Agreement.

**8188 INFORMATION SHEET**

## Member Surcharge & Process Fees:

Rules 12901 and 12903 of the *Customer Code*, and Rules 13901 and 13903 of the *Industry Code* require member firms to pay a *non-refundable* surcharge and *non-refundable* process fees if the member firm or person associated with the member firm is a claimant or respondent in an arbitration at this forum. FINRA will send invoices for process fees to member firms at appropriate stages of the arbitration process.

**TO DETERMINE THE CORRECT SURCHARGE, USE THE "AMOUNT IN DISPUTE" FIGURE ON LINE 3, PAGE 17.**

If you are a MEMBER CLAIMANT, use this table (Rules 12901 or 13901) to determine the appropriate member surcharge that MUST accompany your Statement of Claim when it is filed with FINRA. If your claim does NOT disclose or specify a monetary claim, the non-refundable surcharge is $1,500.

**Member Surcharge**

| Amount in Dispute (exclusive of interest and expenses) | Surcharge |
|---|---|
| Up to $2,500 | $150 |
| $2,500.01–$5,000 | $200 |
| $5,000.01–$10,000 | $325 |
| $10,000.01–$25,000 | $425 |
| $25,000.01–$30,000 | $600 |
| $30,000.01–$50,000 | $875 |
| $50,000.01–$100,000 | $1,100 |
| $100,000.01–$500,000 | $1,700 |
| $500,000.01–$1,000,000 | $2,250 |
| $1,000,000.01–$5,000,000 | $2,800 |
| $5,000,000.01–$10,000,000 | $3,350 |
| Over $10,000,000 | $3,750 |
| Non-Monetary/Not Specified | $1,500 |

**V.** **HEARING INFORMATION**

1. For claims of $25,000 or less under NASD Rules 12800 (simplified customer/investor) and 13800 (simplified industry): *(check one)*

   ☐ I am requesting a hearing in this matter　　　　☐ I am not requesting a hearing in this matter

2. For claims between $25,000 and $50,000, I am requesting: *(check one)*

   ☐ One arbitrator　　　　　　　　　　　☒ Three arbitrators

FINRA Arbitration
UNIFORM SUBMISSION AGREEMENT

## Claimant(s)

**In the Matter of the Arbitration Between**

Name(s) of Claimant(s)

Charles Jason Moran

**and**

Name(s) of Respondent(s)

Piper Jaffray & Co., d/b/a Piper Jaffray

1. The undersigned parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, cross claims and all related counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations, and/or *Code of Arbitration Procedure* of the sponsoring organization.

2. The undersigned parties hereby state that they have read the procedures and rules of the sponsoring organization relating to arbitration.

3. The undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The undersigned parties further agree and understand that the arbitration will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations, and/or *Code of Arbitration Procedure* of the sponsoring organization.

4. The undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5. The parties hereto have signed and acknowledged the foregoing Submission Agreement.

Charles Jason Moran

Claimant Name (please print)

Claimant's Signature                                                                7/14/08
                                                                                    /Date

Claimant Name (please print)

Claimant's Signature                                                                Date

**If needed, copy this page.**

21

## PROOF OF SERVICE

STATE OF CALIFORNIA          )
                             )    ss.
COUNTY OF SAN FRANCISCO      )

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Nichols Kaster & Anderson, LLP, One Embarcadero Center, Suite 720, San Francisco, CA 94111.

On July 15th, 2008, I served the within document(s):

**Claims Information Sheet and Uniform Submission Agreement,**
**Statement of Claims, Exhibits A-E**

on the person(s) at the address(es) listed below:

### SEE ATTACHED SERVICE LIST

| | |
|---|---|
| X | ***VIA U.S. MAIL:*** By placing the document(s) listed in a sealed envelope(s) with postage thereon fully prepaid in the United States mail at San Francisco, California, addressed as set forth herein. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in the affidavit. |
| | ***VIA FACSIMILE.*** I sent such document(s) by facsimile transmission on ___. I certify that said transmission(s) was/were completed, that all pages were received, and that a confirmation report was generated by facsimile machine phone number (415) 277-7238 |
| | ***VIA PERSONAL DELIVERY.*** By causing delivery of the document(s) by way of Messenger Service, to _____ |
| X | ***VIA E-MAIL.*** I e-mailed the document(s) to all interested parties in this matter in the ordinary course of business on the date indicated herein. |
| | ***VIA FEDERAL EXPRESS.*** I am readily familiar with the practice of this office for collection and processing of correspondence fro next business day delivery by FedEx, and said correspondent is deposited with FedEx on this date in the ordinary course of the business. |

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed this 15th day of July, 2008, at San Francisco, California.

_Melissa Honkanen_

Melissa A. Honkanen

1

## SERVICE LIST

2

3

4   Gordon Young
    Julie Kole
5   Anne Moriarty
    **KEESAL, YOUNG & LOGAN**
6   450 Pacific Avenue
    San Francisco, California 94133
7   T: 415.398.6000
    F: 415.981.0136
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28